## RAILROAD *v.* GILBERT, PARKES & CO.

### (*Nashville.* January 30, 1890.)

1. COMMON CARRIERS. *Validity of contract limiting carrier's common law responsibility.*

A common carrier may stipulate for limitation of or exemption from his common law responsibility for loss of freight occurring through other cause than his negligence (*e. g.*, accidental fire), provided the contract is supported by a *bona fide* and not merely colorable consideration, and is fair and reasonable in itself in view of all the surrounding circumstances, and the assent of the shipper thereto is fairly obtained.

Cases cited and approved: Marr *v.* Telegraph Co., 85 Tenn., 542; Transportation Co. *v.* Bloch Brothers, 86 Tenn., 397; Dillard *v.* Railroad, 2 Lea, 288; 17 Wall., 357; 112 U. S., 338; 47 L. J., Q. B., 131; 15 Ir. C. L., 37; 3 Wall., 107; 25 N. Y., 442.

2. SAME. *Same. Reasonable alternative must be offered.*

But the carrier must hold himself in readiness to ship with common law responsibility, and must offer to shippers a reasonable and *bona fide* alternative between that mode of shipment and the one with limited responsibility.

Cases cited and approved: Marr *v.* Telegraph Co., 85 Tenn., 545; 15 Ir. C. L., 37.

3. CASE IN JUDGMENT.

Carrier received cotton for shipment from Columbia to Nashville, giving to shipper a bill of lading providing against liability for loss by fire. The cotton was destroyed by fire without the carrier's negligence. Shipper sued the carrier for its value. Said fire clause was interposed as a defense. The proof was that $1 per bale—the freight rate named in said bill of lading—had been, for many years, the only rate for shipment of cotton between said points; that no change of rate had been made when the fire clause was inserted in the bills of lading; that the regular tariff rates between said points was thirty-seven cents per hundred pounds, which would make the cost of shipment of cotton $1.85 per bale; that cotton was not embraced in the

Railroad *v.* Gilbert, Parkes & Co.

list of articles that could be shipped at regular rates; that the carrier's agent at Columbia had no authority to receive cotton for shipment upon any terms except those named in said bill of lading, though he might have obtained authority by wiring the home office.

*Held:* That said " fire clause " in the bill of lading is void.

---

FROM DAVIDSON.

---

Appeal in error from Circuit Court of Davidson County. W. K. McAlister, J.

Baxter Smith for Railroad.

Dickinson & Frazer and Hill & Granberry for Gilbert, Parkes & Co.

Caldwell, J. On October 18, 1885, W. F. Embry, as agent of Gilbert, Parkes & Co., delivered seven bales of cotton to the Louisville and Nashville Railroad Company, at Columbia, Tenn., for shipment to his principals at Nashville.

Before its departure, and while yet in the depot of the company at Columbia, the cotton was destroyed by fire.

Thereafter Gilbert, Parkes & Co. sued the railroad company for non-delivery. The action originated before a Justice of the Peace, from whose judgment there was an appeal to the Circuit Court at Nashville. There the case was tried by his Honor, the Circuit Judge, without a jury, and

judgment was rendered in favor of the plaintiffs for the agreed value of the cotton, interest, and costs.

The railroad company has prosecuted an appeal in error to this Court.

There is no controversy about the consignment, loss, and value of the cotton; nor is there any denial that the defendant company would be liable for the loss under the rules of the common law. These are all conceded.

But it is insisted in behalf of the company that its common law liability was limited by special contract, and that special contract is relied upon in bar of any recovery. The bill of lading under which the shipment was to be made is produced in evidence. It contains a fire clause, which stipulates that the company *shall not be liable for loss or damage by fire.* This is the special contract through which exemption from responsibility is sought.

The plaintiffs deny the validity of that stipulation, and thus the issue for our determination is presented.

It is now too well settled to admit of debate that the common law liability of common carriers may be limited by special contract, even to the extent of denuding them of the character of insurers, except as against their own negligence, or that of their agents and servants; and the limitation may be, and is generally, embraced in the bill of lading delivered to the shipper at the time.

It is not every such special contract, however, that is effective. To be valid it must be fairly obtained, and *just and reasonable.* Under the English Railway and Canal Traffic Act of 1854 (17 and 18 Vict., Ch. 31, Sec. 7) such stipulations are called "conditions," and they can be upheld only when they "shall be adjudged * * * to be just and reasonable."

The same criterion is uniformly applied in this country, and no limitation of the carrier's common law liability, in whatever form made, will afford protection unless *just and reasonable in the eyes of the law. Railroad Company* v. *Lockwood,* 17 Wallace, 357; *Hart* v. *Penn. R. R. Co.,* 112 U. S., 338; *Marr* v. *Telegraph Co.,* 1 Pickle, 542; *Transportation Co.* v. *Bloch Brothers,* 2 Pickle, 397.

Though such is the generally accepted test, the use of these words (just and reasonable) will not always meet the requirements of investigation. What will be just and reasonable in one case may not be so in another. The justness and reasonableness of the condition or limitation must of necessity depend upon the peculiar facts and circumstances of every case—the nature of the article to be conveyed, the hazard of the transportation, the surroundings of the parties at the time, and the mutual advantages given and received.

Referring to the burden and weight of proof, an eminent British author says: "The burden of proving the reasonableness of a condition lies upon the company. The most cogent evidence in favor

28—4 p

of reasonableness is to show that the condition was not forced upon the customer, but that he had a fair alternative of getting rid of the condition, and yet agreed to it." Redman's Law of Railway Carriers (2d Ed.), p. 66, citing *Lewis* v. *Great Western Railroad Co.*, 47 L. J., Q. B., 131.

In further treating the same subject, the same writer, on page 71, says: "To enable a company to rely on an alternative contract offered to the customer, it must appear that such alternative was itself reasonable. A company cannot offer the choice of two unreasonable conditions, and then rely on the one actually chosen." Citing *Lloyd* v. *Waterford and Limerick Railroad Co.*, 15 Ir. C. L., 37.

To the same effect as the latter quotation is the Marr case, decided by this Court in 1886.

There the telegraph company was shown to have had four different rates of charges, with as many different degrees of liability. They were all held to be unreasonable, and the fact that the customer choosing one rate had the option of taking any one of the other three was of no avail to the company in an action for damages. *Marr* v. *Western Union Telegraph Co.*, 1 Pickle, 545.

The alternative must be both reasonable and *bona fide*. If either unreasonable or colorable merely, it will be unavailing as a defense to an action against a carrier.

A company standing before the public as a common carrier, and enjoying advantages and franchises as such, must be ready to do the business

of a common carrier with the full measure of responsibility imposed by the common law; and it may at the same time offer to do the same business with a limited liability, the limitation resting upon a sufficient consideration. An offer, or readiness, to transport the goods of its customer with the one or the other degree of responsibility, at his option, is as little as can be required of any common carrier. Less than this does not present a *bona fide* and reasonable alternative.

Reduction of freight charges is the usual consideration for the diminution of responsibility on the part of the company.

One of the leading principles deducible from the English cases is stated by Mr. Redman in these words: "A condition is reasonable which reduces a company's liability to a minimum, if it is coupled with compensating advantages to the customer (such as cheapness of carriage), and the latter has the alternative of getting rid of the condition by paying a reasonably higher rate." Redman's Law of Railway Carriers, p. 75, Sec. 2.

This language puts the law clearly and meets our unqualified approval. It is reproduced, as the law of the two countries, in a recent American work—American and English Encyclopedia of Law, p. 819, Vol. II.

Fire clauses similar to that before us, when based upon sufficient consideration, have, by the Supreme Court of the United States and by this Court, been held to be valid, and to protect the

company from liability for loss by fire caused otherwise than by the negligence of the company or its agents. *York Company* v. *Central Railroad*, 3 Wallace, 107; *Dillard Bros.·* v. *Louisville and Nashville Railroad Company*, 2 Lea, 288.

In the latter case the Court said: * * * "A lower rate of freight, or something equivalent, will be a sufficient consideration for the stipulation." 2 Lea, 293. In the former it is broadly intimated that a reduction of charges will be presumed to be the consideration for such a stipulation, the language of the Court being, * * * "there is no evidence that a consideration was not given for the stipulation. The company probably had rates of charges proportioned to the risks they assumed from the nature of the goods carried, and the exception of losses by fire must necessarily have affected the compensation demanded." 3 Wall., 113.

In speaking of a stipulation for a limited liability in a railroad ticket, the New York Court of Appeals said: "Like all contracts, to render such a one valid it is indispensable that it have some consideration, which it would not have if the passenger paid the full fare fixed by law. * * * If the service is reduced, the amount of the reward must be reduced in proportion; and if the company is relieved from risk, it must make compensation for that relief by the reduction of fare or otherwise." *Bissell* v. *N. Y. C. R. R. Co.*, 25 N. Y., 442.

The performance of an act which a party is under a legal obligation to perform, does not constitute a good consideration for a promise. Addison on Contracts, Sec. 4. Hence a mere agreement by a common carrier to transport goods furnishes no consideration for a stipulation for less than the common law liability. Lawson on Carriers, Sec. 212.

Having laid down the principles of law by which this case must be decided, we proceed to give them application to the facts disclosed on the trial. In doing this it is necessary to state the material facts not already recited.

J. Baily says: "Have been freight agent at Columbia for the Louisville and Nashville Railroad for about nine years. I received the cotton in question from W. F. Embry, agent of plaintiff. Nothing was said about accepting this bill of lading. No objection was made to the same. The regular rate on this bill of lading was $1 a bale. The regular tariff rate for each 100 pounds is 37 cents, and, estimating a bale of cotton at 500 pounds, would make the cost of shipping between these points, Columbia to Nashville, $1.85 per bale. If this bill of lading had been declined (the one the cotton was shipped under), the shipper would have had to ship by the regular tariff rates, $1.85 per bale, without the fire clause. I do not know how long this form of bill of lading has been in use, but it had been in use for several years, and was acceptable to the shipping public, and no

complaint had been made of it. I do not think there was any fire clause in the one used prior to this. At the time the cotton was shipped I had no other form of bill of lading to ship cotton under. I had no authority, as freight agent, to make any different contract, or to ship goods under any other bill of lading than the one under which these goods were shipped. Nothing was said between Mr. Embry and myself about a special rate; but he took the bill of lading offered without objection, and shipped under this. I would not have shipped this cotton any other way. The rate of $1 a bale has been such about six years, under the bill of lading such as this cotton was shipped under. I have no bill of lading to issue where goods are shipped under tariff rates. No cotton has ever been shipped under tariff rates. Every shipper in Columbia knows that I have the tariff rates posted up in my office; have told W. F. Embry about the tariff rates, but do not remember when. The rate on cotton was the same before the insertion of the fire clause as it is now. If objection had been made about this bill of lading, I would have refused to receive the goods until I had authority from Mr. Champe. A schedule, with the exemptions, was posted up in a conspicuous place in my office at Columbia, but the name, 'cotton,' did not appear in it, but it would have come under our losses; and had frequently talked with Mr. Embry, plaintiff's agent, about the two rates before this shipping."

Railroad *v.* Gilbert, Parkes & Co.

B. F. Champe testified: "I am general freight agent of the Louisville and Nashville Railroad, at Nashville. If Mr. Baily, our freight agent at Columbia, had informed me that Mr. Embry refused to ship his cotton under this bill of lading, in this case I would have instructed Mr. Baily to ship the said cotton by the regular rates of 37 cents per 100 pounds, which would have been done by telegraph. The only two rates we have are the rates under this bill of lading and the tariff rates. This bill of lading, as far as I know, has been in use a long number of years."

The foregoing is the whole of the testimony of these two witnesses. It is quoted at length to show the whole case as made by the defendant. It introduced no other witness.

Leonard Parkes, one of the plaintiffs, stated, in substance, that he had been a shipper over the Louisville and Nashville Railroad many years; that the Merchants' Exchange at Nashville protested against the introduction of the fire clause in the defendant's *form* for bills of lading, and gave the company notice of that protest, and that the rate from Columbia to Nashville was not reduced when the fire clause was inserted, but remained the same as before.

Under these facts, we agree with the learned Circuit Judge in holding that the company is liable for the value of the cotton.

. The special contract for exemption from liability for loss or damage by fire is, by this record,

shown not to be just and reasonable. It was the primary duty of the company to hold itself in readiness to transport goods under the rules of the common law, with all the responsibility of a common carrier. This it did not do. Its agent was furnished with no form for bill of lading for such a shipment. More than that, he had no authority to receive the goods for shipment with such responsibility attaching to the company. He says he had no authority to make any contract but the one he did make, and that he "would not have shipped this cotton any other way." He submitted no alternative to the plaintiffs, and had no authority from his principal to do so, and would not have done so if requested. True he says he would have asked for permission to ship under contract without fire clause if the bill of lading with it had been refused by the customer; and Mr. Champe says he would have granted such permission. What stronger proof could there be that the company was not offering, or ready, or even pretending to do business except upon the most restricted liability? Why the necessity of asking and granting permission to do a thing which the law requires it to be in constant readiness to do? This is the permission that should have been granted in the first instance. From the moment of his employment, the agent should certainly have been clothed with authority to do that which the law *required* him to do, and, after that, he could have been au-

thorized to do that which the law *permitted* him to do.

That he frequently talked with Embry "about the two rates," is an unimportant circumstance, as we see it. If he, at the same time, told Embry what he tells the Court—that he was authorized to issue but the one bill of lading, and that he would ship the cotton no other way—he would certainly not have made the case any better for the company; and if he withheld those additional facts, they remain facts in the case nevertheless, and cannot be rejected because not disclosed to the customer.

Again, no consideration for the fire clause passed to the shipper. The responsibility of the carrier is reduced to a minimum it is true, but there is no corresponding reduction in freight charges. There is no reciprocal concession of legal rights by carrier and shipper. The advantage is all on one side. It is distinctly shown that the rate charged under the bill of lading in this case is the same that was charged before the insertion of the fire clause, and that no reduction was even pretended to be made on account of the introduction of such clause and the customer's assent thereto. The agreement to carry for a price which the company was accustomed to charge without the fire clause, is no consideration for the diminution of liability by the insertion of such clause.

It is said that it is bad faith on the part of

plaintiffs to complain of this clause now, when they may have received the benefit of reduced rates in the past on account thereof. It is unnecessary to decide what force there might be in this suggestion if based upon the real facts of the case. The answer to it, upon this record, is that no such benefit has been enjoyed by the plaintiffs. It is true one of the plaintiffs says he has been the defendant's customer for many years, both before and since the introduction of the fire clause; but it is also true, as already seen, that the price charged has been the same all the time.

It is still further suggested that the shipping public at Columbia have acquiesced in this form of bill of lading for some years without complaint. Such is the proof in the case; and this fact would go far toward establishing the justness and reasonableness of the exemption claimed if the company had all 'the while been ready to carry goods with or without the fire clause, and had accordingly given its customers a fair opportunity of electing for themselves which they would take. But acquiescence alone will not justify the limitation.

The words of Mr. Justice Bradley, in the Lockwood case, are pertinent at this point: "The carrier and his customer do not stand on a footing of equality. The latter is only one individual of a million. He cannot afford to higgle, or stand out and seek redress in the Courts. His business will not admit of such a course. He prefers

Railroad *v*. Gilbert, Parkes & Co.

rather to accept any bill of lading, or sign any paper the carrier presents; often, indeed, without knowing what the one or the other contains. In most cases he has no alternative but to do this or abandon his business." 17 Wallace, 379.

From the defendant's own showing, our conclusion is that the stipulation relied upon is invalid, and affords no protection whatever.

The second and last assignment of error relates alone to new facts disclosed in an affidavit produced on the motion for a new trial. As to this it is sufficient to say that such facts, if considered, could not possibly have changed the result, being alone with respect to matters transpiring subsequently to the shipment and loss of the cotton, and in nowise connected therewith.

Let the judgment be affirmed.

---

### DISSENTING OPINION.

FOLKES, J. I regret exceedingly my inability to concur with the majority of the Court in the opinion just rendered. To my mind a most dangerous and perplexing innovation is established, though clothed in the garb of harmless and well-settled propositions.

The objections to the opinion do not lie on the surface, but lurk in the application of those general principles to the particular facts of the case.

Let us analyze the decision, and ascertain what is exactly the point adjudged. It is this: That a railroad company, dealing with a merchant who has been engaged for twenty years as a shipper over its road, issues a bill of lading for a reduced rate, containing the familiar, if not now almost universal, clause of exemption from loss by fire. The shipper has been in the habit of shipping the same character of freight, on the same character of bill of lading, for six or nine years, containing the same exemption. Nearly three years after the goods were lost by fire, without negligence on the part of the company (so far as any proof tends to show), the shipper institutes a suit before a Magistrate, in which it is stated upon the face of the warrant that it is for a " debt due by failure to carry and deliver cotton according to contract." A judgment is rendered for the plaintiff simply and alone because it was developed in the proof that the agent of the railroad company did not have on hand, at the time of shipment, any other form of bill of lading than the one used, and that no demand or request was made for any other form of bill of lading; but that if the shipper had requested a form of bill of lading with the common law liability of the carrier unlimited, there would have been delay in the issuance of the same until such time as it would have taken the agent to telegraph from Columbia, the point of shipment, to Nashville to the office of the head of the transportation department, when a reply would

have been instantly returned, authorizing the agent to issue the form of bill of lading requested, in which event the freight charge would have been $1.85 per bale instead of $1 per bale, the amount charged upon the bill of lading issued with the limited liability; that it is between forty and fifty miles from Columbia to Nashville, and it does not appear that there was any immediate occasion for haste in the shipment of the cotton, nor that the time taken in telegraphing for instruction would have delayed shipment beyond the period that it would necessarily have been delayed in waiting for the next regular freight train.

Such a conclusion and such a holding is not sustained by the authorities, as I understand them. On the contrary, it appears to me to be in direct opposition to the principles settled in cases of the highest authority, which have been approved and announced by our own Court. It is stated to be placed, by the majority of the Court, upon the general principle that all contracts for the limitation of the common law liability of carriers must be fair and reasonable, a doctrine sound in its statement, but, as I respectfully submit, misconceived in its application to the case at bar. The reasonableness *per se* of the rule which allows a stipulation for exemption from loss by fire, not occasioned by the negligence of the carrier, is abundantly established by the overwhelming weight of authority, and, in the language of this Court in the case of *Dillard Bros.* v. *Louisville and Nashville Railroad Company,*

2 Lea, 293, "it subjects to less restraint the great interests of commerce, upon which so much of our modern civilization rests," quoting in this case the language of the Supreme Court of the United States in *Railroad Company* v. *Lockwood*, 17 Wallace, 360, where it is said by Mr. Justice Bradley: "A modification of the strict rules of responsibility, exempting the carrier from liability from accidental losses, where it can be safely done, enables the carrying interest to reduce its rate of compensation, thus proportionally relieving the transportation of produce and merchandise from some of the burden with which it is loaded." Again, "the natural presumption would be that the shipper was apprised of the contents of the receipt, and assented to its terms, and that a lower rate of freight, or something equivalent, will be a sufficient consideration for the stipulation;" and, to quote from the language of Judge McFarland in the case of *Owell* v. *Adams Express Company*, "this would certainly be so where the terms of the contract were in accordance with the business of the company, to which the shipper had consented in previous transactions."

The length to which the opinion of the majority goes makes extremely pertinent the language of this Court in the case of *Dillard Bros.* v. *Louisville and Nashville Railroad Company*, *supra:* "Some Courts, while yielding to the current of authority on the main point, have, at the same time, run counter to it, and involved themselves

*in useless refinements* by refusing to recognize what Judge McFarland very properly calls the 'natural presumption' arising from the acceptance by the shipper of a bill of lading embodying the stipulations, and by requiring an *uncertain quantum* of evidence *aliunde* to establish a contract.   It were better to adhere to the old law, and refuse to recognize the modern innovations than to resort to *such niceties*, which must lead to *harrassing litigation*, and render it difficult, if not impossible, for the profession to advise.   It is the dictate of common sense that when a written instrument is received, in the execution of a contract, its contents are known and assented to, and *a fortiori* if there be nothing to raise a contrary presumption."

. Now, I respectfully but earnestly submit that the opinion of the majority in this case is doing just exactly what was so strongly reprehended in the cases from which I have quoted, where the language of Judge McFarland in the Owell case was adopted as deploring the introduction of any modification requiring an "uncertain *quantum* of evidence, and resorting to such niceties as must lead to harrassing litigation, and render it difficult, if not impossible, for the profession to advise."

Heretofore, when the shipper presented to his counsel a bill of lading containing the "fire clause," further inquiry was made for the ascertainment as to whether or not there had been any negligence on the part of the company, and when told that there was no proof of negligence attainable,

the lawyer could, with certainty, state that there was no liability.

Under the new order of things which this opinion establishes, as I understand it, the attorney would proceed to inquire whether the shipper had been tendered or offered any other form of bill of lading, and when told that no such offer had been made, he would then be told the company was. liable because he, the shipper, "had not had an opportunity of exercising the option" of accepting a limited or unlimited liability bill of lading, and if the shipper should further inform his attorney that he had made no request for a different form of bill of lading, and that he had for years been shipping on identically the same form of bill· of lading, he would be told that that would not prevent a recovery for the value of the freight, for the reason that in the case of *Louisville and Nashville Railroad Co.* v. *Gilbert, Parkes & Co.* it had been decided that the railroad company would be liable unless it should, with the burden of proof upon it, affirmatively show that such opportunity had been tendered to the shipper and declined by him; and that it would make no difference if in twenty years as a shipper no such bill of lading had been asked for, where the company had failed to provide such a form, or authorized its agent to issue one if the shipper *had* asked for it. In other words, it is not necessary to show that the shipper wanted another form of bill of lading, and it is not sufficient to show that he knowingly

accepted the bill of lading containing the "fire clause;" but you must go further, and ascertain whether the agent of the railroad company *would have issued* him another form containing the common law liability if he *had asked* for it.

I very much fear that such a conclusion can but lead to unnecessary litigation, and great confusion and uncertainty in the administration of justice. It invites and renders necessary the performance of an *idle ceremony*, meaningless and deceptive, as a preliminary to the obtaining of the benefit by the common carriers of the country of the privilege that is abundantly and universally admitted to exist. The carrier must have on hand, and tender, a form of bill of lading which the previous dealings with the shipper has informed the carrier is not wanted.

The plaintiff shows by his own testimony that he knew all the facts; that for twenty years he had been a shipper of cotton over this road.

The opinion of the majority is not as full as it might be in its statement of the testimony of the plaintiff, Parkes, in this: That after stating that the Merchants' Exchange in Nashville had protested against the introduction of the "fire clause" in the defendant's form of bill of lading, and had given notice of that protest, it fails to show that this was *after the loss of these goods by fire*, or at least that the language of the witness is susceptible of this interpretation.

The language of this plaintiff is as follows: "As

29—4 p

a member of the Merchants' Exchange I know that the Exchange held a meeting and protested against the insertion of this fire clause in this bill of lading, and a copy of this protest was served against the railroad company *after the loss of these goods by fire* I went to Louisville to see Mr. Knott who is the general traffic manager of this railroad. I told him that myself and other merchants of Nashville were anxious that he should make two rates for the shipment of cotton, one of which should exclude the fire clause."

There being no punctuation of the above in the transcript, it is difficult to say whether the language, "after the loss of these goods by fire," applied to the time of the protest or to the time of his going to Louisville to see Mr. Knott. But it is immaterial, for the reason that if it applies to the time of the protest, it shows affirmatively that he had knowledge of the fire clause, and that, with that knowledge, purposely accepted a bill of lading giving him the benefit of a reduced tariff, without calling for the common law liability; and if it applies to the time of his going to Louisville, of course it was incompetent, and should not have been admitted in evidence.

That the "fire clause" is not unfavorably considered is shown by the case of *York Company* v. *Central Railroad*, 3 Wallace, 107. In that case the plaintiff's positions were (1) that Trout & Co., agents at Memphis, who shipped the cotton and received the bill of lading, had no authority to

Railroad *v.* Gilbert, Parkes & Co.

consent to such a condition; (2) that it did not appear that any consideration existed for such limited liability in the reduced rate of fare or otherwise.

Let us see how this tribunal answered these questions. It said: "The first of these positions is answered by the fact that it nowhere appears that the agents disclosed their agency when contracting for the transportation of the cotton. So far as the defendant could see, they were themselves the owners." The second proposition is answered by the fact that there is no evidence that a consideration was *not given* for the stipulation. The company probably had rates of charge proportioned to the risks they assume from the nature of the goods carried, and the exception of losses by fire must necessarily have affected the compensation demanded. Be this as it may, the consideration expressed was sufficient to support the entire contract made." This case has in terms been approved by this Court in *Owell* v. *Adams Express Co., supra.*

If the spirit of this decision is followed, there is no trouble in reaching a fair and reasonable result in the case at bar. It would say that Embry did not disclose his principals. He confessedly knew of the fact that the company had *two rates*—one with and one without the "fire clause;" for he had, in the language of the witness, "frequently talked with Embry, the plaintiffs' agent, about the two rates before this shipment"—

and that his knowledge and acceptance was the knowledge and acceptance of the plaintiff; second, it would say that the proof shows that if dissatisfaction had been expressed with the $1 rate, accompanied with the limited liability, the shipper could have obtained the $1.85 rate if he had waited for a few moments for a telegram from the agent at Nashville, and that, in the absence of proof that the necessity for the shipment of the cotton was so pressing that a delay would have been injurious, such delay would not be wrong or negligent on the part of the carrier, especially where it does not appear that there would have been any delay in the shipment; for the company was under no obligation to send this cotton by a special lightning express, but had the right to hold it until the next regular freight-train coming to Nashville. It would further say that a limitation in favor of the company, and with a reduced rate, will not deprive the company of its benefit when the shipper has had the advantage of such reduced rate, simply because it appears in a suit brought nearly three years afterward that the company did not have on hand a form of common law bill of lading. Moreover, it would have been held that, having gotten the benefit of the lower rate for six or nine years, it was too late now to say that he was not bound because he was not *offered* any other rate.

The shipper is charged with knowledge of the law that authorized him to demand a common law

liability of the carrier; and his acceptance in silence of the bill of lading with the "fire clause" is a waiver of such demand or right, in the absence of fraud, where it appears that there was a difference in the freight charges for a limited and for an unlimited liability. Not having spoken when it was his duty to have done so, the law now enjoins silence, when he has for years pocketed the fruits of his silence heretofore.

The limitation of the carrier's liability as an insurer against fire is not to be confused with limitations that are not favored, and with efforts to avoid the consequences of the negligence of the carrier or his agents.

When, therefore, we have to deal with a limitation against loss by fire, without fault or negligence on the part of the carrier, there is no reason why the same general principles applicable to knowledge and estoppel between individuals other than carriers should not apply. For instance, the presumption of acquiescence is made where the shipper receives without complaint a bill of lading containing this limitation; and he is estopped to say that he was ignorant of the contents of the bill of lading, as we have already seen is fully established in this State in *Railroad* v. *Brumly*, 5 Lea, 401, and *Dillard Bros.* v. *Railroad*, 2 Lea. But suppose our predecessors had looked at the cases cited, and decided them in the spirit and on the logic of the case at bar, such presumption and estoppel would have been refused recognition.

In the language of the opinion of the majority here, the inquiry there would have been, Is the limitation "fair and reasonable?" to be determined upon the facts of each case as it arises, "with the burden of proof on the carrier to show it fair and reasonable in each case." And it would have been held unfair and unreasonable to bind the shipper to a loss that, in his ignorance of the terms of the bill of lading, he had never assented to.

But we have only to turn to approved text-books to see that this fire limitation is favored, and that knowledge does estop in a contract with a common carrier as with other people.

Mr. Hutchison, in his excellent work on Carriers, says, speaking of knowledge: "The theory upon which they all stand is that, if a party, knowing his published terms, employs the carrier without objection, a contract according to those terms is implied between the employed and employer."

Again this author says: "Every man of ordinary intelligence knows that no individual or company engaged in the business of carrying to distant places now undertakes to carry his goods subject to the old common law liability of the carrier. He knows, moreover, that bills of lading are constantly given, not only as the evidence of the receipt of the goods, but as an express and direct notice that they will be carried on certain terms. Knowing this, he cannot be willfully blind, and

Railroad *v.* Gilbert, Parkes & Co.

plead ignorance when it was his duty to know; and *knowing in such cases is assenting. If it was his intention to hold the carrier to his common law liability, he should have said so, and have either declined to employ him or sued him for his refusal, after tendering a reasonable sum for his services or risk."* And he says this is in accordance with the English and American decisions, and adds: "Nor is there any thing unreasonable in this." Hutch. on Car., Secs. 238–240.

Now, if this be true of a shipper making his *first shipment,* how much more emphatic is it by way of estoppel against a shipper of twenty years with the same company, where the last six or nine years' business was upon the identical bill of lading sued on here.

Does not his previous acquiescence and acceptance of this particular bill of lading, without complaint or demand, amount to a *waiver of the offer or tender of another form?* It would seem so. And if the offer or tender be waived, then it must be that the company need not, *as to such shipper* certainly, have had on hand, or been prepared to issue instanter, a common law bill of lading, that the shipper's long course of dealing led the carrier to believe would not be called for.

Again, at Section 241 of Hutchison on Carriers, it is said: "Accordingly, when the owner of the goods accepts such a [bill of lading or receipt] he is conclusively presumed, in the absence of fraud

and imposition, to have assented to its terms and conditions."

We have, at the present term, held what had been heretofore approved by this Court: That an insurance company would be conclusively adjudged to have waived a written stipulation in its policy concerning the void character of insurance upon property on leased ground, where that fact is not written on the policy, because it would be a fraud upon the assured to allow the insurance company to hold the premium on a policy known by it to have been void at the time of its issuance.

Now, we are unable to see why the same principle would not preclude a party who has for years accepted the benefit of a reduced rate of freight, in consideration of a limited liability of the carrier, from defeating that stipulation by saying, *after the loss*, that " You did not give me an opportunity to elect which form of bill of lading I would take." The shipper, having gotten the benefit of the reduced rate, should not be heard to say the contract was void, and so known to him at the time. If the one proposition can be accepted as sound, I see no occasion for refusing to apply the same principle to this case. They both relate to insurance against fire only. It will not do to say that the public character and the public duties of the carrier require that a different rule should be applied to it than would be applied in the case of the insurance company; for in the case at bar it concerns alone the benefit or ad-

vantage that the particular shipper has already de-
rived by his silence, and gives the company the
benefit of a clause which has been repeatedly said
to be reasonable.     Nor does it suffice to say that
this Court has held, in *Marr* v. *Telegraph Com-
pany*, 85 Tenn., that it is not necessary for a
party dealing with one of these public corporations
to speak.     In the Marr case there were four al-
ternatives presented, all of which were held to be
"unreasonable and oppressive," and the effort was
to escape liability for a loss occasioned by the
negligence of the telegraph company, while the
exemption of the carrier from the liability of an
insurer, for a sufficient consideration, is not un-
reasonable nor unfavored.     On the contrary, as we
have seen and have said, adopting the language of
the Supreme Court of the United States in *York* v.
*Central Railroad Company*, 3 Wallace, that there is
"no good reason or principle why parties should not
be permitted to contract for a limited responsibil-
ity.     The transaction concerns them only; it in-
volves simply rights of property, and the public
can have no interest in requiring the responsibility
*of insurance* to accompany the service of transpor-
tation, in the face of a special agreement for its
relinquishment."

But the opinion of the majority attempts to
make out a case, and seems to take it for
granted that it has made out a case, where, as a
matter of fact, there was no consideration for
such limited liability, because, forsooth, it is said

the rate of $1 on the bill of lading *with* the "fire clause" was the same as the rate six or nine years before on the bill of lading *without* such "fire clause."

The fact that the rate *to-day* on the bill of lading *with* the fire limitation is the same as it was *years ago without* such limitation, is no proof that the rate of to-day is not fixed in consequence of such limited liability, even in the absence of all other proof on the subject.

Before any probative effect can be given this fact or circumstance to overcome the presumption of a consideration, you have to *negative the idea* and *destroy the right* of the carrier to *change* its tariff of charges, from time to time, to meet competition and other exigencies. I say, in the absence of proof (except that relied on by the majority as showing no consideration, to wit: $1 *before* and $1 *after* the adoption of the "fire clause"), it does not follow *that at the time of the issuance of the particular bill of lading sued on here* there was not another and a higher rate for the full common law liability. The consideration need not be great, because, in the language of the books, some consideration, however slight, is sufficient, and the consideration will be presumed from the manifest and absolutely necessary difference of responsibility. But we are not left to fall back on these well-settled principles, nor to indulge in presumption; for the proof is *clear* and *uncontradicted* that at the *time of the issuance* of this bill of lading the

rate for cotton, with the common law liability, was $1.85. This positive and uncontroverted proof surely cannot be overcome by a presumption predicated upon the mere fact that six or nine years *before this time* the company carried the common law liability at $1, the same price that it now charges for the limited liability; nor can this proof be affected one way or the other by the fact that the company had no printed bill of lading on hand, and had not instructed its agent in relation thereto.

While, in the opinion of the majority, this fact may make the company liable as not giving the shipper opportunity to get something he did not ask for and did not want, it cannot *disprove the uncontradicted* fact that there were *two rates*—one of which could be obtained instanter at $1 with the limitation, and the other at $1.85 without any limitation, obtainable by waiting until the agent could telegraph to the general freight department at Nashville.

It must be noticed that there was no occasion to telegraph to Nashville to ascertain what the common law liability rate was. This was known to the agent, and it is positively testified to by him that it was $1.85 per bale; and this was also known to the plaintiffs, through their agent, Mr. Embry. The telegram was therefore not necessary to *ascertain the rate*, but merely to get instructions as to the issuing of such a form.

It does seem that there was no more necessity

for the company to keep on hand a form of bill
of lading that was never called for than there
would be for a merchant to keep on hand goods
for which there is no demand. Indeed, it may
be safe to say that the company would have a
right to make a *rule* that where it was to be
held liable as an insurer against loss by fire for
such combustible material as cotton, notice should
be given the home office by the local agent, so
that special provision might be made to protect
itself by obtaining re-insurance, provided that it
did not cause such delay as would incommode or
injure the shipper. If the shipper wanted insur-
ance there were two avenues open to him to ob-
tain it—one by paying the company the increased
rate of freight, the other by insuring in a regular
insurance company; and it is a matter of com-
mon information that insurance can be obtained
from an insurance company generally for a smaller
amount than is usually charged by the carriers for
the insurance liability.

Certainly, it seems to me, with due deference to
my learned associates, that every principle of jus-
tice and fairness revolts at the idea of allowing
the shipper to have *insurance* where he has know-
ingly refused to apply and pay for it, either to
the transportation company or to the insurance com-
pany. To hold the transportation company now lia-
ble as an insurer, is to do so upon *ex post facto* in-
quiry, *aliunde* the contract, and in violation of what
I regard as elementary principles of law and morals.

If the opinion of the majority concerned alone the disposition of the case in hand, I would have been content with the mere announcement of my non-concurrence; but where the spirit and tendency of the decision appears to me hurtful, I deem it my duty to point out, even at the expense of weariness to myself and the bar, the dangers to which it may lead.

The spirit and tendency to which I refer is to be found in the strictness with which the common law liability of the carrier is sought to be enforced, and the severe conditions imposed as necessary to obtaining the benefit of a contract for limited liability.

Indeed, the difference between myself and the majority may be said to be, that in my opinion a contract for exemption from loss by fire not resulting from the negligence of the carrier, should be construed liberally and fairly, in accordance with the intention of the parties, in the absence of fraud or imposition, while the majority opinion applies a degree of strictness in considering such contract which, in many cases in practice, would amount to prohibition. It seems to me that every exemption or condition is, in the opinion of the majority, placed upon the same footing and construed with equal strictness, without regard to the policy which should govern in the treatment of the sundry exemptions.

This is happily illustrated by the quotation with which the majority opinion closes, as follows: " The

carrier and his customer do not stand on a footing of equality. The latter is only one individual of a million. He cannot afford to higgle, or stand out and seek redress in the Courts. His business will not admit of such a course. He prefers rather to accept any bill of lading, or sign any paper the carrier presents; often, indeed, without knowing what the one or the other contains. In most cases he has no . alternative but to do this or abandon his business."

Such language may be well enough in the case in which it was used, when applied, as was done there, to a case where the carrier was seeking to obtain the benefit of a contract exempting it from a claim for damages for a personal injury to a passenger, occasioned by the carrier's own negligence; but the same language, when applied to a contract exemption for loss by fire, without negligence, becomes misleading, and tends, though unintentionally, to inflame the mind of the trier, whether Judge or jury. The quotation, I respectfully suggest, is as inapplicable to the facts of the case at bar as it is to the law.

To my mind the case in hand, instead of being viewed in the light of the quotation above, should have been decided in the light of the language of the same Judge in the same case, where, speaking of such exemption as is the subject of decision in the case at bar, he says: "A modification of the strict rules of responsibility, exempting the carrier from liability for accidental losses, where it can be

safely done, enables the carrying interest to reduce its rate of compensation, thus proportionally relieving the transportation of produce and merchandise from some of the burdens with which it is loaded." Which, as we have seen, has been approved by our own Court.

For the reasons stated, I am constrained to dissent from the views of the majority, both as to the conclusion reached and the reasoning upon which such conclusion rests. This I do with great respect for my esteemed associates, whose views are the result of a careful consideration of the case.

From my point of view the judgment of the Circuit Court should be reversed and judgment rendered here for the defendant.