NASHVILLE, CHATTANOOGA & ST. LOUIS RAILWAY *et al.*
v. STONE & HASLETT.

'(*Nashville.* December Term, 1903.)'

1. **COMMON CARRIERS.** Contracts of through transportation limiting liability to their own lines are valid; consideration is not necessary.

   A common carrier is under no legal obligation to transport goods beyond its terminus, and when contracting for through transportation, it may lawfully stipulate that it shall not be liable for loss after the goods have passed beyond the limits of its own line and upon the lines of another. It is not necessary that such stipulation be supported by any consideration.· (*Post,* *pp.* 355-358.)

   Cases cited and approved: Dillard v. Railroad, 2 Lea, 288; Railroad v. Brumley, 5 Lea, 401; Transportation Co. v. Bloch, 86 Tenn., 392; Telegraph Co. v. Munford, 87 Tenn., 190; Bird v. Railroad, 99 Tenn., 719.

2. **SAME.** Same. No liability for delay according to scheduled time known to shipper, when; special train not required.

   Where the initial carrier receives and forwards a shipment of live hogs at the earliest practicable schedule time, involving a delay of four hours at one of its own connecting lines, a schedule well known to the shipper, and in view of which the shipment was made, : o duty devolves upon such carrier to make up a special train to forward such shipment, and where it delivers the hogs in good condition, and practically on schedule time, to the connecting and forwarding line, it is not liable for the injured condition of the hogs when delivered to the consignee, where it stipulated in the contract of shipment that its liability should cease upon its delivery to the forwarding carrier. (*Post,* pp. 358-361.)

Railroad v. Stone & Haslett.

3. **SAME.** Contracts limiting common law liability are valid, when.

A common carrier may limit its common law liability for loss or damage of freight not caused by its own negligence, if the special contract be fairly obtained, just, and reasonable, and upon sufficient consideration; but the carrier must at the time hold itself in readiness to transport the freight with or without such limitation, and must allow the shipper a reasonable and *bona fide* alternative between the two modes of shipment. (*Post, pp.* 354-355, 361-368.)

Cases cited and approved: Railroad v. Wynn, 88 Tenn., 321; Railroad v. Gilbert, 88 Tenn., 430, 431-435; Railroad v. Manchester Mills, 88 Tenn., 653, 655; Lancaster Mills v. Cotton Press Co., 89 Tenn., 31; Railroad v. Sowell, 90 Tenn., 17, 24; Deming v. Cotton Press Co., 90 Tenn., 327; Railroad v. Craig, 102 Tenn., 301, 302.

4. **SAME.** Same. Contract cannot be avoided because executed hurriedly, carelessly, or ignorantly, if no fraud.

A shipper cannot avoid the limitations imposed by a special contract by showing that he executed it hurriedly, or without due care, nor by showing that he was ignorant of the provisions of the contract, where no fraud on the part of the carrier appears. (*Post, pp.* 355, 367.)

Cases cited and approved: Coles v. Railroad, 41 Ill. App., 607; Johnstone v. Richmond, 39 S. C., 55; Insurance Co. v. Railroad, 72 N. Y., 90; Bethea v. Railroad, 26 S. C., 96; Insurance Co. v. Railroad, 72 N. Y., 90; Hill v. Railroad, 73 N. Y., 351.

5. **SAME.** Same. Testimony of shippers that they had never been offered a common law contract, and knew of none is competent, when.

The testimony of the plaintiffs and other shippers that they had no knowledge of any bill of lading for the shipment of live stock other than the special live stock contract limiting the common law liability, and did not know of any other contract

Railroad v. Stone & Haslett.

under which stock could have been shipped, and that they had never been offered any other or different contract in all their experience as shippers, was competent to show whether the carrier had a common law contract of shipment, and held itself in readiness to give, the shipper the benefit of such alternative, and to contradict the evidence of the carrier in this respect. (*Post, pp. 353-354, 368-369.*)

6. **SAME. Same. Burden to show negligence rests upon shipper, and the absence of it upon carrier, when.**

In a suit against a common carrier for a loss of goods shown, in the absence of a special contract limiting its liability, the carrier must affirmatively show that the loss was occasioned by some cause for which it was not responsible, as for instance, the act of God or the public enemy; but where there is a limited liability contract, and the loss falls within one of the excepted clauses, the burden of proof is upon the shipper to show the carrier's negligence. (*Post, pp.* 369-371.)

Cases cited and approved: Runyan v. Caldwell, 7 Hum., 134; Burke v. Railroad, 7 Heis., 462; Railroad v. Mitchell, 11 Heis., 404; Sommers v. Railroad, 7 Lea, 201; Railroad v. Holloway, 9 Bax., 188; Merchants' Dispatch, etc., Co. v. Bloch, 86 Tenn., 392; Railroad v. Wynn, 88 Tenn., 331; Railroad v. Reeves, 10 Wall., 176; Transportation Co. v. Downer, 11 Wallace, 129; Clark v. Barnwell, 12 How., 272.

7. **SAME. Same. Same. Case in judgment showing negligence and supporting verdict against carrier.**

Where it appears that there was a delay of about seven hours wholly unaccounted for by the carrier in the shipment of hogs from Nashville to Louisville, that the weather was very warm, and the hogs were left exposed to the heat of the sun, standing on the side tracks at different stations, that they had been in the possession of the final carrier nineteen hours, and had been in transit for over twenty-eight hours, without being fed or watered as required by act of congress in interstate shipments,

and when they were delivered nearly a third of them were dead, there is sufficient evidence of negligence to support the verdict against the carrier holding it liable for the loss, notwithstanding a special contract limiting its common law liability. (*Post, pp.* 353-354, 371-373.)

8. **SAME.** Terms "other animals" refer to the hogs shipped, when.

Where in a contract for the shipment of hogs, it is agreed that certain classes of animals and fowls shall be of a certain value, and then provides that "other animals" shall be valued at a certain sum, the terms "other animals" refer to the hogs shipped. (*Post, pp.* 373-376.)

9. **SAME.** Contract fixing value of property shipped is valid, when.

A contract fairly made, fixing a reasonable value on property shipped, is not void as against public policy, nor for any other reason. (*Post, pp.* 374-375.)

Cases cited and approved: Railroad v. Sowell, 90 Tenn., 19; Railroad v. Starnes, 91 Tenn., 518; Hart v. Railroad, 112 U. S., 331, 343.

Case cited and distinguished: Railroad v. Wynn, 88 Tenn., 320.

10. **SAME.** Contract value of property shipped is void, when.

A contract of shipment fixing the value of hogs at five dollars each, where they are shown to be worth two or three times this much, is unreasonable and void. (*Post, pp.* 376-377.)

Case cited and approved: Railroad v. Lockwood, 17 Wall., 379.

11. **SAME.** Evidence of market value of property shipped, where validity of contract fixing value is in issue, when.

Evidence of the market value of the hogs shipped is admissible, notwithstanding a contract fixing their value and limiting liability for their loss at five dollars each, where the validity of the contract was in issue for want of consideration and for

other causes, where the court charged that if the contract was valid, the recovery should be limited to the value fixed, but that if it was invalid, then the recovery should be the market value. (*Post, pp.* 373-377.)

FROM BEDFORD.

Appeal from the Circuit Court of Bedford County.— W. C. HOUSTON, Judge.

COOPER & COOPER and C. S. IVIE, for Railroads.

CLAUDE WALLER and J. D. B. DE BOW, for Nashville, Chattanooga & St. Louis Railway.

JOHN BELL KEEBLE, for Louisville & Nashville Railroad Company.

CHARLES C. TRABUE, W. B. BATES, and THOS. R. MYERS, for Stone & Haslett.

MR. JUSTICE MCALISTER delivered the opinion of the Court.

Stone & Haslett recovered a verdict and judgment in the circuit court of Bedford county against the defendant railroad companies for the sum of $900 as dam-

Railroad v. Stone & Haslett.

ages for injuries to four car loads of hogs shipped from Shelbyville, Tennessee, to Louisville, Kentucky.

Both defendants appealed and have assigned errors.

The cause of action, as outlined in the first count of the declaration, was as follows:

"That at 4 o'clock on September 2, 1899, they (plaintiffs) delivered in good condition at Shelbyville, Tennessee, to the defendants, as such common carriers operating such connecting lines, 363 head of hogs, the property of the plaintiffs, contained in four cars of the defendants, and in consideration of the sum of $164—being $41 per car, and the full tariff rate charged by the defendants for the transportation of said freight—which was paid at the time by the plaintiffs to the defendants, and for which the defendants, as common carriers, received said hogs to be safely carried and delivered within a reasonable time in like good and sound condition in which they were received, to plaintiff's consignees, Mansfield and Jeffries, at Louisville, Kentucky; and the plaintiffs aver that the defendants failed to deliver said hogs within reasonable time and in good and sound condition, as they were bound to do, but, on the contrary, wrongfully and negligently delayed said hogs in transit to their destination, and kept them confined in the cars in which they were shipped without food, water, or rest for more than twenty-eight hours after receiving same, when they should and could have been delivered at their destination within seventeen hours from the time they

were received; and by reason of the negligence of the defendants and unreasonable delay in the transportation and delivery of said hogs and freight to plaintiff's consignees 113 of said hogs perished and died, being of the value of $1,043.19, which was a total loss to the plaintiff," etc.

It will be observed that under this count plaintiff sought to recover for a breach of the carrier's common-law duty.

The second count of the declaration sets out a written contract of affreightment and alleges a breach of said special contract.

The defendants pleaded the general issue, and also the following special defenses, viz.: (1) That the Nashville, Chattanooga & St. Louis Railway received the hogs under the written contract, and that it transported them with reasonable diligence from Shelbyville to Nashville, and at the latter point delivered them in good condition, within a reasonable time, to the Louisville & Nashville Railroad Company. (2) That it only agreed to transport the hogs from Shelbyville to Nashville, and at the latter point to deliver same to its connecting carrier. (3) That the several clauses of the written contract limiting defendant's common-law liability are valid, and that these clauses exempted from all liability except for gross negligence; that there was no negligence; and that in no case can there be recovered for more than $5 per head, this being the amount agreed upon as the reasonable value of the animals shipped.

Plaintiffs filed replications to the pleas of the Nash-
ville, Chattanooga & St. Louis Railway, averring that
the written contract was without a valuable considera-
tion; that plaintiffs were imposed upon and deceived
by defendant's agent; and that the live stock contract
was a fraudulent device, conceived for the purpose of
avoiding its common-law liability as a common carrier.

The Nashville, Chattanooga & St. Louis Railway filed
demurrers to these replications, assigning various
causes, but which demurrers were disallowed and over-
ruled by the court.

The first assignment of error is that there is no evi-
dence to support the verdict.   This assignment of error
is based upon the assumption that the special contract
of shipment entered into between the parties was valid
and enforceable, and that the plaintiff failed to show a
breach of any stipulation of the special contract.   It is
denied by the defendants that the written contract was
supported by any consideration.   It is charged that it
was not fairly obtained, for the reason that the shipper
had no choice of a contract with and without the com-
mon-law liability of the carrier.   One of the stipulations
of the written contract was that the Nashville, Chatta-
nooga & St. Louis Railway was to be liable for loss or
damage only while the stock was being transported upon
its own line,   It is provided therein that the Nashville,
Chattanooga & St. Louis Railway shall transport each
car load of stock from the initial point of shipment to
Nashville, Tennessee, but it guaranteed a through rate

of freight to Louisville, Kentucky, the final destination. The specific stipulation of the contract is as follows:

"It is further distinctly understood by the parties hereto that all liability of the Nashville, Chattanooga & St. Louis Railway, as carrier of the said stock, shall cease at its destined station, if on said company's railroad; but if destined to a point beyond said company's railroad, then at the company's freight station at its terminus, when ready to be delivered to the owner, consignee or carrier whose line may constitute a part of the route to destination."

In *Merchants' Dispatch Transportation Company* v. *Bloch Bros.,* 86 Tenn., 392, 6 S. W., 881, 6 Am. St. Rep., 847, it was said as follows:

"It is likewise settled that a common carrier is not bound in law to transport goods beyond its terminus, and that it may therefore lawfully stipulate that it shall not be liable for loss after the goods have passed beyond the limits of its own line and upon the line of another."

This doctrine is approved in the case of *Bird* v. *Railroad Company,* 99 Tenn., 719, 42 S. W., 451, 63 Am. St. Rep., 856, in the following language:

"The contract of shipment was made between the shipper and the initial carrier, and was for through transportation from receiving point to destination. The printed form, contract, or bill of lading then in use by the carrier contained the provision that in case of loss, damage, detriment, or delay the railroad in whose actual custody the goods were at the time of such loss, dam-

age, detriment, or delay shall alone be responsible.  The first carrier had the legal right at its election to undertake the transportation of the goods to the terminus of its own line merely, or to their ultimate destination.  It was under no legal obligation, in the first instance, to transport them beyond the end of its own line, and for that reason it was authorized in law, when contracting for through transportation, to limit its liability by the clause mentioned."  *Railroad Co.* v. *Brumley,* 5 Lea, 401; *Dillard Bros.* v. *Railroad Co.,* 2 Lea, 288; *Telegraph Co.* v. *Munford,* 87 Tenn., 190, 10 S. W., 318; 4 Elliott on Railroads, sec. 1432; Hutchinson on Carriers, sec. 149b.

In the case of *East Tennessee, Virginia & Georgia Railroad Company* v. *A. P. Brumley,* 5 Lea, 401, the headnote is as follows:

"A railroad company receiving goods for shipment beyond the terminus of its line may, by special contract, protect itself against liability for loss not occurring on its own line.  And such contract will be presumed from the fact that a clause thus limiting the liability is to be found printed in the bill of lading, even though the shipper's attention was not called to it, if it appears that he had previously shipped like articles and taken like bills of lading."

In view of these principles and the special contract in this case, the duty imposed upon the Nashville, Chattanooga & St. Louis Railway was to promptly deliver in good condition the consignment of hogs to its connect-

ing carrier.    It was not necessary that such a stipulation be supported by any consideration.    The common-law liability of the common carrier did not extend beyond the terminus of its own line, and there is nothing in this contract limiting the common-law liability of defendant company on this subject.   Such a stipulation in a contract has uniformly been upheld regardless of consideration.

The question, then, is presented whether any loss or injury to this consignment of hogs occurred while it was in transit on the road of the Nashville, Chattanooga & St. Louis Railway.

The proof is undisputed that the shipment of hogs left Shelbyville for Wartrace on defendant's road at 4 o'clock p. m. on September 2, 1899.   The train reached Wartrace without delay or accident of any kind at 4:50 p. m.   The first freight train to Nashville on the main line after the hogs arrived at Wartrace was due at Wartrace at 8:20 p. m.   This train arrived at 8:50 p. m., or thirty minutes late.   The car load of hogs was attached to this train, and carried to Nashville, reaching the latter point at 12:40 a. m., being ten minutes late.   The regular schedule of the company between Shelbyville and Nashville for shipments of live stock was that they should leave Shelbyville at 4:20 p. m., and make connection at Wartrace at 8:20 p. m.   This schedule had been observed for a long time, and the evidence shows that plaintiffs were thoroughly familiar with this schedule when they made the shipment.   It was stated that they

selected the afternoon train on account of the hot weather, and to get the benefit of. the night run..

The proof is undisputed that when the four car loads of hogs left Wartrace and reached Nashville the hogs were in good condition. It appears that · four hours elapsed from the arrival of the hogs at Wartrace until their departure, but no negligence is imputed to defendant company on this account, since it forwarded the hogs on its first freight train leaving Wartrace after their arrival. No duty devolved upon defendant company to make up a special train and forward these hogs to Nashville, especially as the shippers were advised of the forwarding train, and consigned the hogs from Wartrace to make connection with that particular train. They were well aware that the delay at Wartrace would be unavoidable in order to make connection with the first forwarding freight train to Nashville. As already stated, the hogs reached Nashville at 12:40 a. m., and, in accordance with an established usage existing between the two railroad companies, the cars containing the hogs were delivered to the Louisville & Nashville Railroad Company on what is known as the "Clay street track." It appears from the record that this transfer track was in charge of a joint clerk representing both companies, and that this clerk, in accordance with his duty, kept a record of the cars of stock delivered by the Nashville, Chattanooga & St. Louis Railway upon this transfer track for transportation over the Louisville & Nashville Railroad. The record kept by this clerk shows

that these particular cars were delivered upon said transfer track by the Nashville, Chattanooga & St. Louis Railway at 1:50 a. m., September 3, 1899, and the hogs were apparently in good condition. The proof is that this was a delivery by the Nashville, Chattanooga & St. Louis Railway to the Louisville & Nashville Railroad Company, and was so regarded by both companies. It further appears that these cars were transferred by the Louisville & Nashville Railroad from the Clay street line at 2:50 a. m., and delivered in East Nashville at 2:58 a. m. It further appears that the train containing these four cars left Nashville for Bowling Green, Kentucky, at 4:45 a. m., September 3d. The proof shows that Bowling Green was reached at 10:45 a. m., September 3, 1899, and the hogs were then in good condition. The train left Bowling Green at 12:30 a. m., September 3d, and arrived at Louisville that evening about 8:25 o'clock. The proof is undisputed that the hogs sustained no injury in course of transportation over the line of the Nashville, Chattanooga & St. Louis Railway. Indeed, it is shown by evidence which is not controverted that nine hours after the hogs were delivered to the Louisville & Nashville Railroad Company they were in good condition. The only suggestion of negligence chargeable to the Nashville, Chattanooga & St. Louis Railroad Company is that the hogs were permitted to remain at Wartrace four hours before being forwarded to Nashville; but, as already stated, they were shipped at the earliest practicable schedule time, and this fact was well

known to the shippers before the hogs left Shelbyville. As already stated, no duty was imposed upon defendant company to make up a special train and forward these hogs to Nashville in view of the facts stated.

So we conclude there is no evidence whatever in the record to support the verdict of the jury so far as it attached any liability to the Nashville, Chattanooga & St. Louis Railway Company for injury and loss in this shipment.

We will now proceed to consider the assignments of error made on behalf of the Louisville & Nashville Railroad Company.

The sixth assignment is as follows:

·Common carriers may limit or exempt themselves from common-law liability by special contract, except for their own negligence or that of their employees, provided the contract is made upon a genuine consideration to the shipper to compensate him for surrendering his right to hold the railroad liable as a common carrier, and that the contract is fair and reasonable in view of all the circumstances; and, further, that the shipper assents to the same knowingly and understandingly. It is a question of fact for them to decide from the evidence whether this contract was knowingly and fairly accepted by the plaintiff, so as to make it binding."

It is also objected that the court charged: "If the shipper assents to the same knowingly and understandingly; that is, he may have the option and choice that he can ship under the common-law contract, which

gives the carrier no exemption from common-law liability, by paying more for this way of shipment, or that he can ship by special contract at a less rate, which gives certain exemptions to the carrier, so that he can have the alternative of choosing between two terms of shipment."

Again, the court charged: "The defendants had a right to a special contract to limit their liability, not from their own negligence; but to do this they were bound to give to the plaintiffs at the time an opportunity to choose upon just and reasonable terms between the special contract and the common-law contract that made them liable for full damages."

Now, it is insisted that in these instructions the court committed two errors, viz.:

(1) In holding that, in order to make the contract valid and binding, it must appear that the shipper assented to it knowingly and understandingly.

(2) That it was also necessary to the validity of such a contract that the shipper must have been given at the time an opportunity to choose between the two contracts.

It is insisted that the only duty required of the carrier was that he should be ready and willing to accept the stock upon its common-law liability, if demanded by the shipper.

It is further insisted that it was not incumbent upon the agent of the company to notify the shipper of the two forms of contract, or to give to the shipper at the

time an opportunity of choosing between the two contracts.

These limited carrier contracts have frequently been before this court for consideration, and the principles of law governing them are well settled.   In the case of *Railroad Co.* v. *Manchester Mills,* 88 Tenn., 655, 14 S. W., 315, this court said, viz.:

"A contract exempting the carrier from liability for the loss by fire, not due to negligence, and based upon a sufficient consideration, the shipper having the right to elect between a liability with and without fire clause, is valid, and a through bill of lading, where the shipment is over more than one line, or upon reduced rates, is a sufficient consideration."   In the case last referred to the court says:

"It is well settled that a common carrier may make a stipulation in its bill of lading to limit its common-law liability for loss or damage of freight not caused by its own negligence, but this cannot be validly done unless the carrier at the time holds himself in readiness to transport the freight with or without such limitation, and allows the shipper a reasonable and *bona fide* alternative between the two modes of shipment."

The same rule is laid down in the following cases: *Railroad* v. *Gilbert Parks & Co.,* 88 Tenn., 431, 12 S. W., 1018; *Railroad Co.* v. *Wynn,* 88 Tenn., 321, 14 S. W., 311; *Lancaster Mills* v. *Merchants' Cotton Press Co.,* 89 Tenn., 31, 14 S. W., 317, 24 Am. St. Rep., 586; *Railroad Co.* v. *Craig,* 102 Tenn., 301, 302, 52 S. W., 164.

In the case of *Railroad* v. *Gilbert, Parkes & Co.*, 88 Tenn., 430, 12 S. W., 1018, Judge Caldwell, speaking for the court, among other things, said, viz.:

"It is not every such special contract, however, that is effective. To be valid, it must be fairly obtained, and just and reasonable.". Again, the court says:

"A company standing before the public as common carrier, and enjoying the advantages and franchises as such, must be ready to do the business of a common carrier, with the full measure of the responsibility imposed by the common law; and it at the same time may offer to do the same business with a limited liability, the limitation resting upon a sufficient consideration. An offer or readiness to transport the goods of its customer with the one or other degree of responsibility, at his option, is as little as can be required of any common carrier. Less than this does not present a *bona fide* and reasonable alternative. Reduction of freight charges is the usual consideration for the diminution of responsibility on the part of the company."

In *R. R. Co.* v. *Sowell*, 90 Tenn., 24, 15 S. W., 838, the court said, viz.:

"Both the witness for plaintiff and defendant agreed that no other contract than that signed was tendered, but they also agreed that no other was demanded. It was therefore competent for the defendant to show that it was willing and ready to execute another upon terms reasonable to the shipper, if he preferred it, in which no agreed valuation or limitation of

liability was required as a prerequisite to the shipment. He need not specifically tender another contract. An offer or readiness to make it is sufficient. *Railroad Co. v. Gilbert, Parkes & Co.,* 88 Tenn., 431-435, 12 S. W., 1018; *Railroad Co. v. Manchester Mills,* 88 Tenn., 653, 14 S. W., 314."

This principle is also recognized in the case of *Deming & Co. v. Merchants' Cotton Press, etc., Co.,* 90 Tenn., 327, 17 S. W., 93, 13 L. R. A., 518, where the following language is used:

"The option need not in fact be offered to the shipper. It is sufficient if it would have been given had he demanded it"—citing *Railroad Co. v. Manchester Mills,* 88 Tenn., 653, 14 S. W., 314; *Louisville & Nashville Railroad Co. v. Sowell,* 90 Tenn., 17, 15 S. W., 837.

It is conceded by plaintiffs that they did not demand any other contract of affreightment, while the agents of the company admit that they did not offer any other alternative than the live-stock contract, but claim they would have shipped the hogs under common-law liability if plaintiff had so required. The written contract recites on its face that it is made in consideration of a special rate lower than the tariff rate charged when this contract is not executed. The regular tariff rate was double the rate charged in this live-stock contract as appears therein.

It will be observed that the charge of the circuit judge embodied the salient features presented in the text of the cases decided by this court, and in many instances

the exact language of the court is imported into the charge.

But it is said that mere readiness on the part of the carrier to issue a common-law bill of lading, if demanded by the shipper, was all that is required.

The circuit judge, in his charge, embodied this idea in the following language, viz.: "The plaintiffs are entitled to have the *bona fide* alternative of choosing between the two contracts, and an offer or readiness to ship the hogs with either contract on the part of the defendant's agent was necessary, and was sufficient." If the counsel desired more explicit instructions on this branch of the case, supplementary requests should have been submitted; but certainly the court, in its general charge, has presented the law on this subject as laid down by the decisions of this court.

The court further instructed the jury that "an agreement to ship the hogs at a less rate than their regular tariff rate would be a valuable consideration to plaintiff to accept the special contract. An agreement or the giving of a bill of lading through to Louisville would be a valuable consideration, and in deciding whether there was a fair consideration for the special contract you will decide what was the regular tariff rate— whether it was $82 per car, or whether it was $41 per car. Also the giving of free transportation to plaintiff or his employees would be a valuable consideration."

The proof showed that the live-stock contracts were signed both by the railroad agent and the shippers, and

that for many years the shippers had been signing similar contracts, and must have been aware of their contents. "The shipper cannot avoid the limitations imposed by the special contract by showing that he executed it hurriedly, or without due care, nor by showing that he was ignorant of the provisions of the contract. If he executed the contract by affixing his signature, or by accepting without objection a receipt containing the limitation, he will be conclusively presumed to have assented to its provisions, no fraud on the part of the carrier appearing." 5 Am. and Eng. Ency. of Law, p. 300; *Coles* v. *Louisville R. R. Co.*, 41 Ill. App., 607; *Johnstone* v. *Richmond*, 39 S. C., 55, 17 S. E., 512. In the latter case the court said: "The shipper was not obliged to sign the contract without reading it, and, if he saw fit to do so, he must take the consequences." Again, it was said by Mr. Justice McGowan in *Bethea* v. *Northwestern R. R. Co.*, 26 S. C., 96, 1 S. E., 376, viz.: "It would tend to disturb the force of all contracts if one in possession of ordinary capacity and intelligence were allowed to sign a contract and act under it in the enjoyment of all its advantages, and then to repudiate it upon the ground that its terms were not brought to his attention. In the absence of all fraud, misrepresentation, or mistake, it must be presumed that he read the contract, and assented to its provisions." *Germania Fire Ins. Co.* v. *Memphis, etc., R. R. Co.*, 72 N. Y., 90, 28 Am. Rep., 113; *Hill* v. *Syracuse, etc., R. R. Co.*, 73 N. Y., 351, 29 Am. Rep., 163.

In the first line of the contract it is recited that the tariff rate on this shipment from Shelbyville, Tennessee, to Louisville, Kentucky, is $82 per car; thus indicating clearly to the shipper the regular tariff rate. It is then recited that the company will transport the stock at the reduced rate of $41 per car in consideration that the shipper will accept certain risks of transportation. The record shows that the shipping agents of defendant company had instructions to issue a bill of lading with common-law liability if the shipper demanded it, and that the tariff rate on such a bill of lading should be twice the special rate. It is shown that the agent of the company at Shelbyville was authorized to receive these hogs for shipment without the execution of a special live-stock contract, but upon the company's common-law liability. There is other evidence that the agent at Shelbyville stood ready and willing to receive live stock for transportation without the execution of the live-stock contract.

The next assignment of error is that the court erred in admitting, over the objection of defendants, testimony of the plaintiffs below and of other shippers to the effect that they had no knowledge of any bill of lading for the shipment of live stock other than the special live-stock contract under which this shipment was made, and did not know of any other contract under which stock could have been shipped; that they had never been offered any other or different contract in all their experience as shippers.

We think this testimony was relevant to the issue whether defendant company had a common-law contract of shipment and held itself in readiness to give the shipper the benefit of such an alternative. These shippers, it appears, had been transacting business with the company for many years, and had never been advised of such alternative contract. In this view the evidence was competent for the purpose of contradicting the evidence introduced on behalf of the company tending to show that the company held itself in readiness to give the shipper benefit of such common-law contract.

The sixth assignment is that the court erred in instructing the jury as follows:

"It devolves upon the plaintiff to make out his case by a preponderance of the evidence, but, if the hogs were delivered to defendants in good condition, and put in the cars in proper amount, and when they reached their destination any part of them were dead or injured, the burden of proof is upon the defendants to show that they are not guilty of negligence in causing their death or damage. The mere fact that the hogs were dead when they reached their destination at Louisville does not absolutely fix the liability upon the defendants, but devolves upon them the necessity of showng that their death did not result from their fault or negligence."

This language, as applied to the special limited contract, would be erroneous; but the court immediately proceeds to explain that this is the rule that would ap-

112 Tenn—24

ply if the contract was not binding—that is to say, upon the common-law liability of the carrier; but, if the contract was binding, and the loss was caused by delay in transportation, the company would be exempt from liability by the special conditions of the contract, and in such a case the burden of proving negligence would devolve upon plaintiffs. This was a correct exposition of the law. In the absence of a special contract limiting his liability, the carrier must affirmatively show that the loss was occasioned by some cause for which he was not responsible—as, for instance, the act of God or the public enemy—but where there is a limited liability contract, and the loss falls within one of the excepted causes the burden of proof is upon the shipper to show negligence.

In the case of *Railroad Company* v. *Manchester Mills,* supra, one of the questions at issue was in respect of the burden of proof where the contract of shipment exempted the company from liability by loss from fire, and the court in that case held as follows:

"In a suit against a common carrier for loss of goods shipped on a valid contract exempting from liability by loss from fire not due to its own negligence, proof of the mere fact of the loss of the goods by fire, without more, raises no presumption of negligence against the carrier. The plaintiff must in such case aver and the burden of proof lies upon him to prove affirmatively, that the loss by fire resulted from the carrier's negligence." Hutchinson on Carriers, section 767; *Railroad* v. *Mit-*

*chell,* 11 Heisk., 404; *Sommers* v. *Mississippi & Tennessee R. Co.,* 7 Lea, 201; *Merchants' Dispatch, etc., Co.,* v. *Bloch Bros.,* 86 Tenn., 392, 6 S. W., 881, 6 Am. St. Rep., 847; *Burke* v. *Louisville & Nashville R. Co.,* 7 Heisk., 462, 19 Am. Rep., 618; *Railway Co.* v. *Wynn,* 88 Tenn., 331, 14 S. W., 311; *Runyan* v. *Caldwell,* 7 Humph., 134; *Railroad Co.* v. *Reeves,* 10 Wall., 176, 19 L. Ed., 909; *Transportation Co.* v. *Downer,* 11 Wall., 129, 20 L. Ed., 160; *Clark* v. *Barnwell,* 12 How., 272, 13 L. Ed., 985; *M. & C. R. R.* v. *Holloway,* 9 Baxt., 188.

The next assignment of error is that there is no evidence to support the verdict and judgment against the Louisville & Nashville Railroad Company. The evidence establishes the fact that the cars containing the hogs were delivered upon the Clay street track by the Nashville, Chattanooga & St. Louis Railway at 1:50 a. m., September 3, 1899, and the evidence is undisputed that this transfer constituted a delivery to the Louisville & Nashville Railroad. The hogs at that time were in good condition. They left Nashville on the Louisville & Nashville Railroad at 4:45 a.m., and reached Bowling Green, Kentucky, at 10:45 a. m., in apparent good condition. Nine hours had thus elapsed since the hogs left the custody of the Nashville & Chattanooga Railroad, and were still in good condition apparently. The hogs left Bowling Green at 12:30 p. m., September 3, 1899, and arrived in Louisville at 8:25 p. m. the same day. The proof is that the hogs were in bad condition when they left Bowling Green at 12:30, and continued to die between

that point and Louisville. It will thus be seen that these hogs remained in possession of the Louisville & Nashville Railroad Company in Nashville for about three hours before they were started for Louisville at 4:45 a. m. There was a further delay of nearly two hours at Bowling Green before the hogs were started for Louisville at 12:30 p. m. in bad condition. They reached Louisville at about 6:30 p. m., but were not delivered to the consignee until about 8:25 p. m., a delay of nearly two hours. Here is a delay of about seven hours wholly unaccounted for by defendant company.

The proof is that the weather was very warm, and the hogs were left exposed to the heat of the sun, standing on the side tracks at these different stations, and when they were finally delivered to the consignee, 116 of the number, or nearly one-third of the entire consignment, were dead. While they were in possession of the Louisville & Nashville Railroad Company they had been in transit or course of transportation for over twenty-eight hours, during which time they had not been fed or watered as required by act of Congress in interstate shipments.

It is conceded by counsel for plaintiffs that until about 12:30 p. m. of the second day—the time of leaving Bowling Green for Louisville—the hogs were in good condition. As stated by him: "It was the last stage of the trip from Bowling Green to Louisville that resulted so disastrously. If these hogs had been delivered in Louisville by mid-day of September 3d, the next day after

their shipment, the loss would have been comparatively small. The record shows that the Louisville & Nashville Railroad Co. had the hogs in its possession for a period of nearly nineteen hours. The hot ride in the sun on the second day, without food and water, was undoubtedly the occasion of the loss and damage to these hogs."

It is in the proof that a freight train left Nashville for Louisville at 2:35 a. m., September 3d, and it is not satisfactorily explained from this record why these hogs were not forwarded to Louisville on that train, instead of being delayed for a later train leaving Nashville at 4:45 a. m. This in itself is evidence of negligence. We think that there was sufficient evidence to support a verdict against the Louisville & Nashville Railroad Company, conceding that the live-stock contracts are binding.

The last assignment of error is that the court erred in admitting testimony, over the objection of defendants, touching the market value of the hogs that died before reaching the point of destination. The insistence made on behalf of the company is that the value of the hogs is to be determined by the valuation clause contained in the special live-stock contract as follows:

"And it is further agreed that should damage occur for which the said party of the first party may be liable the value at the place and date of shipment shall govern the settlement, in which the amount claimed shall not exceed, for a horse or mule, $100.00; cattle, $30.00 each; chickens, ducks and guinea fowls, 75 cents per dozen;

geese $1.00 per dozen; turkeys, $1.50 per dozen; other animals at $5.00 each; which amounts it is agreed are as much as such animals herein agreed to be transported are reasonably worth."

In *Railroad Co.* v. *Sowell,* 90 Tenn., 19, 15 S. W., 837 such a stipulation in a live-stock contract was held valid upon the ground that it was not a mere exemption from liability, but was an assumption of liability to the full limit of the value of the property as agreed upon by the parties to the contract. It was said such contract, fairly made, is not void as against public policy, or for any other reason citing *Hart* v. *Pa. R. R. Co.,* 112 U. S., 331, 343, 5 Sup. Ct., 151, 28 L. Ed., 717.

It was held in that case that the valuation clause referred to the particular horses injured, and was as definite and specific in effect as though it had named or perfectly described the horses shipped. It was in reference to them, and only them, it became a contract when signed and accepted by the shipper and needed no more particular reference.

The case of *Railroad Co.* v. *Wynn,* 88 Tenn., 320, 14 S. W., 311, was distinguished from the Sowell case, upon the ground that in the former there was no agreement as to the value of the animals shipped.

In *Starnes* v. *Railroad,* 91 Tenn., 518, 19 S. W., 675, it appeared certain horses were shipped under a live-stock contract which contained the following stipulation: "And it is further agreed that, should damage occur for which the said party of the first part may be

liable, the value at the place and date of shipment shall govern the settlement, in which the amount claimed shall not exceed, for a horse or mule $100.00, which amount it is agreed is as much as such stock as are herein agreed to be transported are reasonably worth." It was held this was a valid limitation of the liability of the carrier.

It will be observed that the contract now under consideration contains a stipulation almost identical with that adjudged to be valid in the Sowell and Starnes cases. It expressly provides that the valuation therein fixed is as much as such stock as are therein agreed to be transported are reasonably worth. The only indefiniteness on the face of the stipulation contained in the written contracts herein is whether the term "other animals" refers to the hogs shipped. We think no other reasonable construction could be placed on the contract. The stipulation in the contract, after specifying a valuation for certain classes of animals and fowls, then provides that the valuation on other animals such as are herein agreed to be transported is fixed at $5 each as their reasonable worth. It requires no latitude of construction to say that the contract fixing the value of the animals at $5 each referred to the hogs about to be shipped.

The charge of the court touching this special clause in the contract of shipment is also assigned as error.

The court instructed the jury that, if they found the contract was not binding on the plaintiffs, they would

be entitled to recover the market value of the hogs. The court however, continued: "But, if you find the contract is binding, then you will be limited in the amount you shall find for plaintiffs to the sum of $5 per hog for each one lost or damaged, it being stipulated in the special contract that this amount is all defendants shall be liable for in the event of loss, and this sum of $5 per head is agreed upon as the amount said hogs are reasonably worth," etc.

There was no error in the action of the circuit judge in admitting the proof touching the market value of the hogs dead and injured, for, if the jury should find that the special live-stock contract was not binding upon the plaintiffs for want of consideration, or for other cause explained in the charge of this court, then the value of the hogs would be determined by the market rates prevailing at that time, and not by the special limitations of the contract.

It is evident from the damages assessed by the jury that they did not measure the value of the hogs by the valuation clause in the written contract, but applied the market value of the hogs at the time of their loss and injury. So that the charge of the court, if erroneous, was necessarily prejudicial to defendant companies.

While we are of opinion that the term "other animals," employed in the contract, did refer to the valuation of the particular hogs shipped therein, yet we are of opinion, in view of the value of these hogs at the date of their shipment, that the valuation of $5 each was an

unreasonable valuation.  Such stipulations, to be up-held by the court, must be fair and reasonable.   The evidence shows that the hogs shipped were worth two and three times the valuation inserted in the written contract.   In view of the fact that the shipper has to accept the contract tendered by the carrier in order to get reduced rates of shipment, and has little to do with formulating the details of the contract, the courts hold that such limited liability contracts cannot be enforced by the carrier, unless they are fair and reasonable.

As stated by Mr. Justice Bradley in *Railroad* v. *Lockwood,* 17 Wall., 379, 21 L. Ed., 627:  "The carrier and his customer do not stand on a footing of equality.   The latter is only one individual of a million.   He cannot afford to higgle or stand out and seek redress in the court.   His business will not admit of such a course.   He prefers rather to accept any bill of lading or sign any paper the carrier presents."

In view of the real value of these hogs at date of their shipment, we cannot think that a valuation clause of $5 per head is a reasonable stipulation.

The result is the judgment as to the Nashville, Chattanooga & St. Louis Railroad is reversed, but affirmed as to the Louisville & Nashville Railroad.