[No. 8858.   Department Two.   January 4, 1911.]

VICTOR PIERSON *et al.*, *Respondents*, v. NORTHERN PACIFIC RAILWAY COMPANY, *Appellant*.[1]

PARTIES—CAPACITY TO SUE—FILING NAME OF FIRM—WAIVER OF OBJECTION. The provisions of Rem. & Bal. Code, §§ 8369, 8373, providing for the filing of certificates by persons doing business under an assumed name, before maintaining any action or suit, relates only to the capacity to sue, and are waived unless objection is raised by demurrer.

CARRIERS—LIVE STOCK—LIMITED LIABILITY—CONTRACT—VALIDITY —IMPEACHMENT. If freely entered into, a limited liability contract for the shipment of live stock fixing a maximum valuation, on which the transportation rate is based, measures the rights of the shipper for injuries through negligence of the carrier, and the contract is not impeached, as a matter of law, by evidence to the effect that on transferring from one railway to another, the contract was signed hurriedly without reading it, or explanation; especially where the original contract for shipment was of the same character.

SAME—LIMITED LIABILITY—CONSIDERATION—PRESUMPTION. Upon shipping stock under a limited liability contract, it will be presumed, in the absence of evidence to the contrary, that a fair consideration was given in the way of reduced rates.

SAME—LIABILITY—VIOLATION OF FEDERAL STATUTE. A limited liability contract for the shipment of stock prevails in the case of overconfinement of the stock in violation of a Federal statute, as in other cases, where the act was due to negligence.

SAME—ACTIONS—PRECEDENT NOTICE OF CLAIM—REASONABLENESS. A stipulation in a contract for the carriage of live stock providing that written notice of claim for damage shall be given before the stock is removed from the place of destination is unreasonable and inapplicable where the injuries to stock could not be ascertained with any degree of certainty within the time limited, nor where the animals died before their removal.

Appeal from a judgment of the superior court for Spokane county, Sullivan, J., entered January 7, 1910, upon the verdict of a jury rendered in favor of the plaintiffs, in an action to recover for damages to horses transported.   Reversed.

[1] Reported in 112 Pac. 509.

*Edward J. Cannon, Arthur B. Lee, George M. Ferris,. Charles E. Swan,* and *Thomas A. E. Lally,* for appellant.

*D. W. Hurn* and *C. C. Upton,* for respondents.

RUDKIN, C. J.—On the evening of August 6th, 1906, the plaintiffs, Pierson Brothers, shipped a car load of horses over the Oregon Short Line railroad from Dillon, Montana, to Silver Bow, Montana, a distance of sixty miles. On the arrival of the train at the latter point soon after midnight of the same day, the car containing the horses was transferred from the Oregon Short Line to the road of the defendant company for shipment to Sandpoint, Idaho. Before the train left Silver Bow for Sandpoint, the plaintiff Victor Pierson, who had charge of the horses, entered into the common form of live stock contract with the defendant company, which contained the following stipulations and provisions, among others:

"And it is hereby further agreed that the value of the live stock to be transported under this contract does not exceed the following mentioned sums, to wit: Each horse, seventy-five dollars; each mule, seventy-five dollars; each stallion, one-hundred dollars; each jack, one hundred dollars; each ox or steer, fifty dollars; each bull, fifty dollars; each cow, thirty dollars; each calf, ten dollars; each pig, ten dollars; each sheep or goat, three dollars; such valuation being that whereon the rate of compensation to said carrier for its services and risks connected with said property is based. . . . .

"The said shipper further agrees that, as a condition precedent to his right to recover, any damages for loss or injury to any of said stock, he will give notice in writing of his claim therefor to some officer or station agent of the said company before said stock has been removed from the place of destination or mingled with other stock."

The car arrived at Sandpoint on the afternoon of August 8th, and after their removal from the train eleven head of the horses died, and the remaining eight head were materially injured through the alleged negligence of the defendant in the course of the shipment. The present action was instituted

to recover damages for the loss thus sustained. A more detailed statement of the case will be found in *Pierson v. Northern Pac. R. Co.*, 52 Wash. 595, 100 Pac. 999. From a judgment in favor of the plaintiffs, the railroad company has appealed.

The first assignment of error is based on the denial of a motion for nonsuit, interposed at the close of the respondents' testimony, on the ground that they failed to allege or prove a compliance with chap. 145 of Laws of 1907, page 288 (Rem. & Bal. Code, § 8369 *et seq.*), which provides for the filing of the names of persons doing business under an assumed name and that:

"No person or persons carrying on, conducting or transacting business as aforesaid, or having an interest therein, shall hereafter be entitled to maintain any suit in any of the courts of this state without alleging and proving that such person or persons have filed a certificate as provided for in § 1 hereof, and failure to file such certificate shall be *prima facie* evidence of fraud in securing credit." Rem. & Bal. Code, § 8373.

Waiving the question whether "Pierson Brothers" is an assumed name, and whether the act applies to a copartnership doing business in the state of Idaho, we held in *Rothchild Bros. v. Mahoney*, 51 Wash. 633, 99 Pac. 1031, that § 7 of the act of March 12th, 1907, Laws of 1907, p. 271 (Rem. & Bal. Code, § 3715), which contains a similar provision relating to the commencement and maintenance of suits by corporations, only goes to the capacity to sue, and that the objection is waived unless raised by demurrer or answer. That case is decisive of the question here presented.

The remaining assignments of error are based on the refusal of the court to give effect to the stipulations in the contract of shipment as above set forth.

If this contract was freely and fairly entered into, it measures the rights and obligations of the parties, under repeated rulings of this and other courts. *Hill v. Northern Pac. R. Co.*, 33 Wash. 697, 74 Pac. 1054; *Jensen v. Spokane Falls &*

*N. R. Co.*, 51 Wash. 448, 98 Pac. 1124; *Windmiller v. Northern Pac. R. Co.*, 52 Wash. 613, 101 Pac. 225; *Gomm v. Oregon R. & Nav. Co.*, 52 Wash. 685, 101 Pac. 361; *Hart v. Pennsylvania R. Co.*, 112 U. S. 331.

The testimony offered by the respondents to impeach the contract is, as a matter of law, utterly insufficient for that purpose. The following, given by Victor Pierson, one of the respondents, is the only testimony bearing upon that question:

"Q. Who presented that contract to you for signature, if you know? A. Why, supposed to be the agent, or I thought it was the agent. Q. What did he say to you when he came to you with it? A. Are you the man that owns this car of horses? I said, yes, sir, and then, well, he says, you got to come in here and sign this contract if you want to go, you only have ten minutes, because they are ready to pull out. And I went in and signed the contract. Q. Did you say anything to him when he said that to you? A. I said that I had a contract. Q. What did he say? A. Well, he said you got to sign this contract in order to go, your horses as well as yourself. Q. What did you do then or say? A. I just went in and signed the contract, took one of them. Q. Where did you sign the contract? A. I signed the contract in the office. I went into the office and signed the contract, or two of them rather, and I got one of them and walked right out of the depot and went right to the train. We started right out of the yards, but backed in again. Q. What kind of an office was that? that is, how many rooms did you go into? A. It had one room, just one room. Q. How was that room lighted? A. With one lamp. Q. What, if anything, did this contract lay on when you signed it? A. Laid on the desk, or whatever you might term it, as in front or kind of to one side of the partition, and he says just sign up here. It was quite dark in there on account of the lamp was small and I just signed it, and I was in a hurry to catch the train because the car had already passed. Q. Where was that lamp with reference to where you signed? A. It was right on the desk, the counter. Q. How far from where you signed? A. Just a foot or two. Q. Then you could see to read the contract? A. Not plain; no, sir. Q. What did the agent say to you, if

anything, about when your car was going to leave while you were in there with him signing the contract? A. In ten minutes. Q. Where were you when he told you that? Were you in the office or was that before you went into the office? A. Just as we went into the office. Q. Did he say anything to you at the time you signed that contract about there being more than one rate of freight? A. No, sir. Q. Did he say anything to you at the time as to what rate of freight you would have to pay under that contract? A. No, sir. Q. Was anything said at any time or place about rates? A. No, sir. Q. Was anything said to you in any way about the value of the horses? A. Nothing. Q. Have you told us all that was said between you and the agent as far as you can tell us at the time you signed that contract? A. As far as I can recollect now; it is so long ago that is all I can recollect. Q. Was there anything said about a pass or your having a pass? A. Yes, sir. Q. Who said it to you and when? A. This man that had me sign the contract. Q. What did he say? A. He said this is your pass for yourself and horses. Q. When did he say that? A. When I was in the office. It was before— after I signed the contract. Q. Well, after signing the contract what did you do? A. I went right to the caboose and we pulled right out. Q. How long after you got on the caboose before it pulled out? A. Just a few minutes, not over five minutes. Q. Where did it go then? A. It went out of the yard limits and backed in again. Something wrong with the train, the boys said; that is, the trainmen."

At another point in his testimony the witness testified that he did not read or examine his contract until the horses were dying at Sandpoint, two or three days after its execution. The claim of the witness that he already had a contract for the shipment to Sandpoint is not borne out by the testimony. The Oregon Short Line contract only covered the shipment from Dillon to Silver Bow, and the freight was only paid between these points. It is a significant fact that this was also a limited liability contract, differing in degree but not in kind from the contract now under consideration. Under the first contract the animals were shipped as range horses, and the liability in such cases was limited to not exceeding ten

dollars per head. The fact that the contract was not read or explained to the shipper, or that he was asked no questions, or that the contract was signed hurriedly, cannot be permitted to relieve the respondents from its obligations. Written contracts will prove of little avail if parties can avoid the burdens imposed, by signing in haste and closing their eyes to their contents.

"The shipper cannot evade the limitations imposed by the special contract by showing that he executed it hurriedly or without due care, nor by showing that he was ignorant of the provisions of the contract. If he executes the contract by affixing his signature, or by accepting without objection a receipt containing the limitation, he will be conclusively presumed to have assented to its provisions, no fraud on the part of the carrier appearing." 5 Am. & Eng. Ency. Law (2d ed.), p. 300.

"A contract, *ex vi termini*, implies the assent of two or more minds to the same proposition. It follows, therefore, if one sign a written instrument containing mutual stipulations between himself and another, without any knowledge of its contents, there will not be in fact, in the strict sense of the term, a contract between them, though in a legal sense there may be. Where a party of mature years and sound mind, being able to read and write, without any imposition or artifice to throw him off his guard, deliberately signs a written agreement without informing himself as to the nature of its contents, he will nevertheless be bound, for in such case the law will not permit him to allege, as a matter of defense, his ignorance of that which it was his duty to know, particularly where the means of information are within his immediate reach, and he neglects to avail himself of them. Applying this elementary principle to the case in hand, it was clearly the duty of appellant to have examined the contract in question, and fully advised himself as to its contents, before signing it; and if, by a failure to perform this duty, he has sustained an injury, he must suffer the consequences, unless such failure was occasioned by the fraud or artifice of appellee— and this, we understand, appellant claims was the case." *Black v. Wabash St. Louis & Pac. R. Co.*, 111 Ill. 351, 53 Am. Rep. 628.

"The shipper was not obliged to sign the contract without reading it, and, if he saw fit to do so, he must take the consequences." *Johnstone v. Richmond, etc., R. Co.,* 39 S. C. 55.

"It would tend to disturb the force of all contracts, if one, in possession of ordinary capacity and intelligence, were allowed to sign a contract and act under it in the enjoyment of all its advantages, and then to repudiate it upon the ground that its terms were not brought to his attention. In the absence of all fraud, misrepresentation, or mistake, it must be presumed that he read the contract, and assented to its provision." *Bethea v. Northwestern R. Co.,* 26 S. C. 91, 96.

"There being no special parol contract, and there being nothing in the written contract contrary to public policy, plaintiff cannot now assert that the written contract is not binding because he signed it in haste, without reading." *Hengstler v. Flint & P. M. R. Co.,* 125 Mich. 530, 84 N. W. 1067.

See, also, *Nashville etc. R. Co. v. Stone & Haslett,* 112 Tenn. 348, 79 S. W. 1031, 105 Am. St. 955; *McMillan v. Michigan etc. R. Co.,* 16 Mich. 79, 93 Am. Dec. 208; *Arthur v. Texas & Pac. R. Co.,* 139 Fed. 127; *Cau v. Texas & Pac. R. Co.,* 194 U. S. 427.

But this rule is elementary, and sound public policy would not permit of the adoption of any other. We are therefore clearly of opinion that the rights of the parties are measured by the limitations contained in this contract. It is said that no evidence was offered tending to show that the stock was shipped at a reduced rate, but the contract so recites, and there is no evidence to the contrary.

"In the absence of any proof to the contrary, it will be presumed that a fair consideration was given for the special contract in the way of reduced rates of transportation or of special privileges, and such a consideration need not be proved." 5 Am. & Eng. Ency. Law (2d ed.), p. 300.

Again, it is said that the injury was caused by confining the stock in the car for more than twenty-eight hours, in violation of a Federal statute, and that the contract does not

relieve the carrier in such cases. We are not aware that any such distinction exists. This was an act of negligence and nothing more, and in the *Windmiller* case, *supra*, we held that the limited liability would prevail even in a case of theft.

As stated above, the contract contained a further stipulation that, as a condition precedent to the right to recover damages for loss or injury to any of the stock, the shipper would give notice in writing of his claim therefor to some officer or station agent of the company, before the stock was removed from the place of destination or mingled with other stock. This clause of the contract would perhaps be effectual in some cases, but in a case like the present, where the nature and extent of the injuries to the animals surviving could not be ascertained with any degree of certainty within the limited time provided in the contract, the stipulation is unreasonable and inapplicable. *Western R. Co. v. Harwell*, 97 Ala. 341; *Harned v. Missouri Pac. R. Co.*, 51 Mo. App. 482; *Gulf, Colorado & S. F. R. Co. v. Stanley*, 89 Tex. 42; *Houston & Texas Cent. R. Co. v. Davis*, 11 Tex. Civ. App. 24; *Ormsby v. Union Pac. R. Co.*, 4 Fed. 170. Nor has it any application to the animals which died before their removal from the place of destination. *Kansas & A. V. R. Co. v. Ayers*, 63 Ark. 331, 38 S. W. 515.

On the entire record we are therefore of opinion that the recovery should have been limited to seventy-five dollars per head, for the animals that died, with legal interest from the date of the commencement of the action, and to such further sum as the jury might award for injuries to the remaining animals. Inasmuch as the record does not disclose the amount allowed by the jury for this latter claim, we are unable to direct a final judgment at this time. The judgment will therefore be reversed, and the cause remanded for further proceedings not inconsistent with this opinion. It is so ordered.

DUNBAR, CROW, CHADWICK, and MORRIS, JJ., concur.

ON PETITION FOR REHEARING.

[Decided February 8, 1911.]

PER CURIAM.—A petition for a rehearing has been filed by the respondents in this cause, in which it is asserted that, under our former opinion, no recovery can be had for the expenses incurred in good faith in attempting to effect a cure of the injured horses or for the burial of the dead horses. These items of damage were not in issue at the former hearing, nor was a recovery therefor objected to, except on the general ground that no notice of the loss was served on the appellant as required by the terms of the contract of shipment. We are of opinion that a clear right of recovery exists for the expenses thus incurred in good faith, and we did not intend to decide or intimate otherwise on the original hearing. With this explanation the petition for rehearing is denied.