[No. 11490. Department One. January 2, 1914.]

## F. L. DAVIS, *Appellant*, v. NORTHERN PACIFIC RAILWAY COMPANY, *Respondent*.[1]

CARRIERS—OF GOODS—LIMITED LIABILITY—CONTRACTS—VALIDITY—EVIDENCE—SUFFICIENCY. A contract to carry household goods at a reduced rate upon the shipper's signing a contract releasing the goods to a valuation of five dollars per hundred pounds, is not shown to have been unfairly made, by the fact that, when the shipper applied for rates, the agent was unable to give him any and kept him waiting several days to hear from headquarters and finally made the rate himself, presenting the receipt without explaining the two rates; and the shipper cannot claim ignorance of the contract from the fact that he did not read it, where nothing was said to mislead him.

SAME—KNOWLEDGE OF SHIPPER—FRAUD. A shipper of household goods who signs a contract releasing the goods at a valuation of five dollars per hundred pounds in consideration of a lower rate, is bound to know that there was more than one rate, and cannot say that he had no notice of the release clause, in the absence of any misrepresentations, fraud, or deceit.

SAME—CONTRACTS—LIMITED LIABILITY. Where goods had been shipped under a limited liability contract, and were held at a connecting point for prepayment of freight, a change of destination, with prepayment to the new destination at the reduced rate, does not abrogate the original contract limiting the liability, where there was a mere diversion of the goods from one point to another, and the shipper was in a position to insist upon the lower rate.

Appeal from a judgment of the superior court for King county, Dykeman, J., entered March 12, 1913, upon findings in favor of the defendant, in an action to recover the value of goods lost by a common carrier. Affirmed.

*O. E. Sauter* and *Edward Judd*, for appellant.

*C. H. Winders*, for respondent.

CHADWICK, J.—On June 18, 1909, plaintiff tendered some boxes and one bundle of goods to the agent of the defendant at McMurray, Washington, for shipment to Willow City,

[1]Reported in 137 Pac. 464.

North Dakota, a place on the line of the Great Northern Railway Company, it being a connecting carrier. The agent could not give the through rate on the goods. These he had to obtain by wire from headquarters. Some delay followed, and pending notice of the rate, plaintiff signed a limited liability contract releasing the goods to a valuation of five dollars per hundred pounds weight. He then went on his way, leaving the goods to follow. The goods were shipped in a few days to Everett, but were not received by the Great Northern Railway Company for the reason that the freight had not been prepaid. Plaintiff afterwards ordered the goods held pending his decision as to forwarding the goods to another place. Thereafter he went to St. Paul, and through the proper agents of the defendant, prepaid the freight charges and ordered the goods forwarded to Greensburg, Indiana. Plaintiff was given the following receipt:

"$53.72                    St. Paul, Minn. Oct. 20th, 1909.

"Received of F. L. Davis Fifty-three 72-100 dollars to cover charges now against shipment H. H. Gds held at Everett, Wash.—also prepayment for forwarding to Greensburg, Ind. and original shipping receipt with order to forward to Greensburg, Ind. Shipment as per receipt consists of 4 Bxs H. H. Gds—1 Tool Chest Ctd—and 1 Bdl. Mattresses Wpd.                    J. F. Horrigan,

"Freight Claim Agent."

One box failed to arrive at its destination, and this action was brought to recover the alleged value of its contents. The court found that the lost package did not weigh to exceed three hundred pounds, and entered judgment in the sum of fifteen dollars, as provided in the release contract. Plaintiff has appealed.

It is insisted that plaintiff is entitled to recover upon two grounds: First, that the contract was not "fairly made" or "fairly agreed upon," in that appellant did not know that he was releasing the value of his goods when he signed the contract and that the contract is wanting in mutuality; and second, that appellant did not know that there were two

rates, and that he might have shipped at a higher rate without releasing the value of the goods.

Appellant relies upon the case of *Hill v. Northern Pac. R. Co.*, 33 Wash. 697, 74 Pac. 1054. He insists that he has brought the case within the exception recognized in that case. The court there said that the contract must be "fairly made" or "fairly agreed upon." Appellant admits that he made himself sufficiently familiar with the shipping bill and the release to know that they accurately described his goods, and he then signed them. The evidence shows that he did not lack for time to read and understand the papers. No fraud or deceit was practiced by the agent.

"Q. Now, at the time you delivered those goods at the depot at McMurray, tell the court, in your own way, what occurred between you and the station agent. If there was more than one interview, tell what it was and what was said at each interview. (Objection) Now, go on and state to the court what occurred between you and the agent, and if there was more than one interview, state how many and what occurred at each one. A. I had decided to ship the goods to Willow City, North Dakota. I went down to the depot and told the agent, and I asked him, the agent, what the rate was, and he told me he didn't have it, but he would get it within a few hours. All he had to do was to wire to Tacoma. That afternoon or evening I went down, and he says 'I haven't got the rate, but I will surely have it in the morning.' I went home and boxed up my goods and took them to the depot the next morning. He had not yet received the rate but thought he surely would, and he did some growling at that time, and afterwards, because they had not paid any attention to his correspondence. It ran along that day, and I went down the next morning and he had not yet received the rate, holding me there two or three days. That evening after supper I and my son, who worked with me, before I turned the job over to him, who went down and went into the depot, and he says 'I haven't got those rates, but I wont keep you any longer. I will give you a rate for the goods, and let you go.' He wrote out the receipt and everything was blank with the exception of the stipulation (description) on the goods. I saw that he had the goods described right, and I went home and

left the next morning. Q. Was there any conversation between you and him at that time as to the contents of the agreement? A. Not a word. . . . Q. Did you, at that time, read the upper portions of that receipt, or bill of lading? . . . A. No, I did not."

Appellant's son testified substantially as follows:

"I and father went down to the depot to see about the rates and the agent said he didn't have any rates for the goods; told him he would give him a release, not hold them any longer, so he could take up his journey and leave, and ship them; said he would get the rates later on. . . . Q. Was that all that was discussed between your father and him about what the rate would be? A. Yes, sir."

To permit plaintiff to say now that he was misled into signing a release or that he was induced to do so by the agent would be to fly in the teeth of the case of *Pierson v. Northern Pac. R. Co.*, 61 Wash. 450, 112 Pac. 509. In that case, we said:

"The fact that the contract was not read or explained to the shipper, or that he was asked no questions, or that the contract was signed hurriedly, cannot be permitted to relieve the respondents from its obligations. Written contracts will prove of little avail if parties can avoid the burdens imposed, by signing in haste and closing their eyes to their contents."

Courts must rely upon men to make their own contracts, and when it is insisted that a writing has not been fairly made or agreed upon, the testimony to overcome it should be cogent and convincing. We find nothing in the record suggesting that plaintiff did not know, or, having the opportunity, might not have known, all the terms and conditions of the contract signed by him. We are satisfied with the rule declared in the *Pierson* case and adhere to it.

It would seem that our holding on the first proposition disposes of the second one also; for, if appellant had notice of the release clause, he was bound to know that there was more than one rate, for the release is executed in consideration of the charge of the lower rate. This phase of the case is also

covered by authority.   The Supreme Court of the United States, in the case of *Kansas Southern R. Co. v. Carl*, 227 U. S. 639, has passed squarely upon every question raised by appellant.   In the *Carl* case, the plaintiff testified that, though he could read and write and had signed the release and had received the bill of lading, he had not read or asked any question about them and had not been given any information as to the contents of either document and had no knowledge of the existence of the two rates, and if he had known of such difference and the effect of accepting the lower, he would have paid the higher rate.   There was no evidence tending to show any misrepresentation, fraud, or deceit, unless it can be inferred from the fact that the company made no explanation of the rates or the contents of either the bill of lading or the release.   The shipper, as in this case, said that the bill of lading was handed to him with the release which he was asked to sign.   The court, speaking through Justice Lurton, reviewed the former decisions of the court, and held that such contracts were not contracts exempting the shipper from damages resulting by reason of its own negligence, and further,—

"The valuation declared or agreed upon as evidenced by the contract of shipment upon which the published tariff rate is applied, must be conclusive in an action to recover for loss or damage a greater sum.   In saying this we lay on one side, as not here involved, every question which might arise when it is shown that the carrier intentionally connived with the shipper to give him an illegal rate, thereby causing a discrimination or preference forbidden by the positive terms of the act of Congress and made punishable as a crime.   To permit such a declared valuation to be overthrown by evidence *aliunde* the contract, for the purpose of enabling the shipper to obtain a recovery in a suit for loss or damage in excess of the maximum valuation thus fixed, would both encourage and reward undervaluations and bring about preferences and discriminations forbidden by the law.   Such a result would neither be just nor conducive to sound morals or wise policies.   The valuation the shipper declares deter-

mines the legal rate where there are two rates based upon valuation. He must take notice of the rate applicable and actual want of knowledge is no excuse. The rate, when made out and filed, is notice, and its effect is not lost, although it is not actually posted in the station: *Texas & Pacific Railway v. Mugg*, 202 U. S. 242; *Chicago & A. Railway v. Kirby*, 225 U. S. 155."

These authorities are decisive of this case unless we are to hold that the payment of the freight at St. Paul and the receipt hereinbefore set out, are to be held as a new or an original contract. We are satisfied that a new contract was not within the contemplation of the parties. The goods had been shipped and were, in legal effect, in transit. The receipt was not a new contract but was ancillary to and made in an acknowledgment of the old contract. The goods were held because the freight had not been prepaid, and because plaintiff ordered them held for a time. The legal effect of the St. Paul incident was a diversion of the goods from one destination to another. It would be highly technical to hold otherwise, especially so when appellant might, had the goods all arrived at Greensburg, have resisted any claim for an increased freight charge by referring to his original contract. No court would have denied him relief under the facts disclosed in this case, nor do we think that any court would grant him relief if the conditions were reversed, as they are in this case.

Affirmed.

CROW, C. J., MAIN, ELLIS, and GOSE, JJ., concur.