[No. 19948. *En Banc.* December 10, 1926.]

## J. GLANT, *doing business as Pacific Iron & Metal Company, Appellant,* v. LLOYD'S REGISTER OF SHIPPING, *Respondent.*[1]

[1] CONTRACTS (68) — CONSTRUCTION — MATTERS ANNEXED OR REFERRED TO AS PART OF CONTRACT. Lloyd's Register of Shipping is not relieved from liability for negligence of its surveyor in certifying to the qualities of boilers, by reason of a clause appended at the foot of the certificate to the effect that it was issued subject to the rules and regulations of the society providing that it was not, under any circumstances, to be held responsible for any inaccuracy in any report or certificate of its surveyors or for any error, default or negligence, there being no proof offered to show that attention was specifically directed thereto (PARKER, MACKINTOSH, ASKREN, and MITCHELL, JJ., dissenting).

Appeal from a judgment of the superior court for King county, Abel, J., entered September 21, 1925, upon findings in favor of the defendant, in an action for damages for breach of contract, tried to the court. Reversed.

*Riddell & Brackett* and *Thomas N. Fowler,* for appellant.

*Shorts & Denney* and *C. R. Hovey,* for respondent.

HOLCOMB, J.—This action was commenced to recover damages alleged to be the result of the negligent examination and certification by the surveyor of respondent as to the quality and condition of one hundred and ten tons of steel boiler tubes, surplus war material, one lot of twenty-five tons of which was situated at

[1]Reported in 251 Pac. 274; 252 Pac. 943.

Seattle, and two lots of thirty and fifty-five tons respectively, at Tacoma, the whole comprising about six thousand separate steel tubes. The examination and certification were made by one Hastie, surveyor for the respondent at Seattle, at both Seattle and Tacoma, at the request of appellant, with a view of purchase and resale of the tubes by appellant for compensation.

On a trial to the court without a jury, the court made findings and conclusions and entered judgment thereon denying any recovery to appellant.

J. Glant is a junk dealer in Seattle, doing business under the name of Pacific Iron & Metal Company. Respondent is a society, having its principal place of business in London, England, and maintaining offices in the principal seaports of the world, one being at Seattle, for the purpose of gathering and disseminating information relating to shipping. It is not organized for profit and pays no dividends to shareholders, but receives income, in part, from fees paid for services rendered by its appraisers and surveyors for examining ships and shipping materials, the income so received being used to pay expenses. Usually, as a condition for making examinations and surveys for others, by the rules and customs of the society, applicants are required to sign written applications therefor upon a blank form furnished by the society. Appellant had previously, in April, 1922, sought the services of respondent, and had then made application therefor on one of its forms, the material parts of which are as follows:

"Testing of Boiler Steel in the United States Upon Occasional Attendance.

"No. LR NO 9s, Place: Seattle, Washington.
"Date: April 28th, 1922.

"We request that the Committee of Lloyd's Register will instruct their Surveyors to attend at Tacoma,

Wash., to test the steel material manufactured during the emergency of 1918-20, which may have to satisfy the requirements of Lloyd's Register.    .   .   .

"This request is made upon the terms of the Rules and Regulations of Lloyd's Register of Shipping, which provides that:

"While the Committee use their best endeavours to ensure that the functions of the Society are properly executed it is to be understood that neither the Committee nor the Society are under any circumstances to be held responsible for any inaccuracy in any report or certificate issued by the Society or its Surveyors, or in any entry in the Register Book, or other publication of the Society, or for any error of judgment, default or negligence of the Surveyors or other officers or agents of the Society.

(Signed) "PACIFIC IRON & METAL COM.
                    "Steel Manufacturers,
                    "By J. Glant.

"To the Secretary
"Lloyd's Register of Shipping."

The application above set forth was for the examination of a lot of boiler tubes similar to those here in question, but not the same lot. An examination thereof, under that application, was made and certified to by the surveyor of respondent at Seattle to the satisfaction of appellant, and the pipes so examined and certified were resold by appellant without difficulty to the Bordentown Steel & Tube Corporation, of Bordentown, New Jersey.

On August 1, 1922, appellant contemplated the purchase from one Gustav, a junk dealer in Seattle, of three lots of boiler tubes now in question, and the resale thereof. On that date by letter, he made an offer of sale at an increased price to the Bordentown Steel & Tube Corporation, describing the tubes as "seamless steel boiler tubes," as they were thereafter described to him by the surveyor for respondent.

Shortly thereafter, appellant made oral application to Hastie, the surveyor for respondent in Seattle, for an examination of the tubes with a view to his certifying as to their quality and condition, as had been done the April previous with respect to the other tubes. It seems that no written application on the form of the society was required by the surveyor in this instance, and none signed or delivered by appellant. Thereafter, the surveyor examined the three lots of boiler tubes, and at the request of appellant, for his convenience in billing the material, gave to appellant three certificates, one for each lot, all reading the same except as to the quantity and date, as follows:

"LLOYD'S REGISTER OF SHIPPING.
"Seattle, Wash.
"September 12, 1922.

"This is to certify that C. Hastie, the undersigned Surveyor to this Society, did at the request of Mr. J. Glant, Pacific Iron & Metal Co., Seattle, Wash., attend the Todd Dry Docks & Construction Co., Tacoma, Wash., August 8th, 1922, for the purpose of examining approximately 55 tons of seamless steel boiler tubes of 3/16-inch gauge; 2½" outside diameter and 8'-5" in length.

"The tubes were stored under cover and found to be as far as ascertainable in a clean state, free from laminations and surface defects.

"Under physical test the material registered a tensile strength of 50,590 lbs. per sq. inch with an elongation of 40%. Tolerance dimension for thickness eccentricity was noted as .017.

"The 'Expanding', 'Temper', 'Crushing' and 'Flattening' tests were each found in turn to be satisfactory.          (Signed) "C. Hastie
"Surveyor to Lloyd's Register.

"This certificate is issued upon the terms of the Rules and Regulations of the Society, which provides that:

"While the committee use their best endeavours to ensure that the functions of the Society are properly executed, it is to be understood that neither the Committee nor the Society are under any circumstances whatever to be held responsible for any inaccuracy in any report or certificate issued by the Society or its Surveyors, or in any entry in the Register Book, or other publication of the Society, or for any error of judgment, default or negligence of the Surveyors, or other officers or agents of the Society."

Appellant then consummated the purchase of the tubes and the resale of them to the Bordentown Steel & Tube Corporation, and caused them to be shipped to that concern. They arrived at Bordentown, New Jersey, about December 14, 1922. Upon examination, that company refused to accept the tubes because, it claimed, they were not up to standard, particularly in that the walls of the tubes were unduly "eccentric"; that is, varying in thickness; also the tubes were not "seamless", but "lap-welded", rendering them, it claimed, wholly unfit for its use. For these reasons it rejected the tubes, refused to pay for them, and advised appellant accordingly. Appellant, after much controversy with the Bordentown Steel & Tube Corporation, and an investigation of its claim touching the alleged defective nature of the tubes, finally acquiesced in its decision, and now claims to have been justified in so doing.

Appellant suffered a loss in his dealings, because of his inability to dispose of the tubes at a profit, which the court found to be $3,978.99; but the court also found and concluded that the loss was not the fault of respondent or its surveyors, but touching that point, found:

"That the examination made by the said Hastie for said tubes was solely for the purpose of discovering

whether they were tubes in good condition, the tests referred to in the certificate were made of only two or three samples and this was the same sort of examination that had been made by the defendant of the tubes first purchased by the plaintiff.

"That after the inspection of the tubes in Tacoma, which defendant's agent was employed to inspect, there were added to the quantities shipped, certain other tubes referred to in the testimony as stay-tubes, of a larger size, and which were stored in a separate rack, and which formed a part of the shipment tendered to the purchaser at the point of delivery.

"That the aforesaid tubes had been sold by the plaintiff as seamless tubes, and a large portion of the tubes were lap-welded and not seamless, and the purchaser of the tubes from the plaintiff required seamless tubes for the purpose of being redrawn, but neither the plaintiff nor the defendant knew of this fact at the time of examination."

Certain technical facts and trade practices concerning steel tubes are undisputed. Steel boiler tubes are of two kinds, seamless and lap-welded. The seamless tube is one made from one solid piece of steel, having a hole punched through it and then elongated by the process of manufacture into a tube, which has no seam or weld throughout its length. A lap-welded tube is first manufactured as a long, thin, narrow sheet. The edges or sides of the sheet are cut at an angle, and the sheet is then folded over to form a tube, and the edges welded together. The weld does not run straight up and down, as it would if the wall radiated out from the center, but runs at an acute angle through the side of the sheet. Seamless tubes are used in fire tube boilers in which the flames pass through the tubes, the tubes being surrounded by the boiler. Lap-welded tubes are used particularly in Scotch marine boilers. In that kind of a boiler, the water is in the tubes and the flame circulates around the tubes. Appellant had not

seen the boiler tubes in question, but bought them from his seller as seamless boiler tubes, and offered them to the Bordentown corporation as seamless steel boiler tubes. They were all 2½ inches outside diameter dimension, but some of them were 3/16 inches, some 4/16 inches and some 5/16 inches in thickness of wall. Nearly all of them, apparently, ran oversize, that is, they were somewhat thicker than their nominal thickness.

Under the universal trade custom, while a certain amount of eccentricity in the thickness of the walls of the tubes is allowed, it must not exceed ten per cent in eccentricity. It appears that these tubes, to a great extent were undoubtedly eccentric, and so far off gauge that it was difficult to know for what gauge they were intended. A very large tonnage of the shipment, after rejection by the Bordentown corporation because of over-eccentricity, and because not seamless, were found to be lap-welded tubes, and not as specified. The material appellant had sold to the Bordentown corporation in April, 1922, as seamless steel tubes were also surplus war material, which is always examined and tested at the place of manufacture. That material was also sold "subject to Lloyd's inspection". That material seems to have been satisfactory to the Bordentown corporation, as no complaint was made against it. The material involved here was represented by Gustav to appellant as a lot of one hundred and ten tons of seamless boiler tubes, with their different thicknesses, and the quantity of each kind of material, most of which was at Todd's Drydock, in Tacoma.

There is conflict in the evidence as to the substance of the conversation between appellant and Hastie, the surveyor, when respondent was orally employed to do this certifying. Hastie denies that there was any men-

tion of resale. This is in conflict with his own evidence that he gave the three certificates to appellant for appellant's convenience in billing the material, and otherwise would have given but one certificate. Hence, we must presume that Hastie knew that appellant purchased the material for resale. Hastie also asserted that he was employed only to make a cursory examination of the material to ascertain its then condition, and for no other purpose. That, when he certified that they were seamless steel boiler tubes, he did so because appellant had represented to him in his request for the examination that they were seamless boiler tubes. But Hastie knew that appellant was not a boiler-tube manufacturer, or an expert in that line, and we are convinced by the evidence that he knew that appellant had never seen the material. He knew, therefore, that Lloyd's was called upon to make an expert examination of the material; that the price charged for the examination as specified by the society of fifty cents per ton for boiler steel contemplated that kind of an examination. Hastie himself admits that he did not give the material that kind of an examination, but gave it only such a cursory examination as would determine the then condition of the material, and ascertain whether or not it was in as good condition externally as when manufactured, and he examined only a very few pipes of the entire lot, which he found to be in good condition, still usable, and good boiler tubes. His cursory examination to ascertain the external condition of the tubes he made in their stored condition, to see if they were rusty, or otherwise in a bad condition. He did not examine the tubes for eccentricity, and said that he could not examine them for that without an examination of considerable length, extending over days or weeks.

Other witnesses testified that such an examination was practically valueless.

In reliance upon such an examination, appellant accepted the service, and forwarded the tubes to the buyer as material which should have brought $5,775 under the agreement with appellant, but which actually lost him considerable money.

We think the trial court overlooked the facts that Hastie charged the highest price in the society's schedule of charges for certificates as to boiler materials; that the examination required was more than a merely cursory one; made no such examination as that contemplated, and that Hastie also knew appellant purchased the materials for resale. These findings disagree somewhat with the findings of the trial court on the facts. Having arrived at these findings on the record, in our examination *de novo,* we are now compelled to examine the questions of law involved on this appeal.

[1] As a defense to this action, respondent pleaded rule 26 of the rules and regulations of the society and the excerpt therefrom in the former application signed by appellant in April, 1922, and the excerpt therefrom attached to each certificate given by the surveyor after his signature.

Respondent maintained in the lower court, and asserts here, that the oral employment in this case was upon the understanding that it was made under the same terms as the former employment of April, 1922, in which appellant then signed the application, where the provisions of rule 26 of the society were incorporated over and above the signature of appellant, and in plain print. It also contends that, even if the contract entered into in April, 1922, could not be considered as a part of the contract in this case, nevertheless appel-

lant is still bound by notice of that provision of the contract and of rule 26 of the society, because it was brought to his attention in each and every one of the certificates.

Appellant concedes that, if the exemption from liability, incorporated in the written application of April, 1922, is in force in this case, it would bind him as a contract, whether he had read it or not. That such is true has been decided by us in *Pierson v. Northern Pacific R. Co.*, 61 Wash. 450, 112 Pac. 509. Respondent had a right to make appellant sign a similar application to that signed in April, 1922, before it would do business with him, but did not. The evidence being in conflict as to whether such a contract was implied as a part of the oral contract governing this transaction, no court can say that that written application and its exemption from liability should constitute a part of the oral agreement in this action. Contracts against liability for negligence are not favored by law in any event. In some instances; such as involve common carriers, they are prohibited as against public policy. In all such cases, contracts should be construed strictly with every intendment against the party seeking its protection. *Crew v. Bradstreet Company,* 134 Pa. 161, 19 Atl. 500, 7 L. R. A. 661.

When respondent was at liberty, and had the opportunity, to require a written instrument signed by appellant before doing the work, we may not arbitrarily import it into, and make it a part of, the contract.

The question, then, resolves itself into whether the notice of the exemption from liability, attached to each and every certificate, binds the opposite party, if his special attention was not called to it.

We consider it determined in this state that statements on other parts of the writings, not in terms made

a part of the writing itself, are not terms of the contract. *Menz Lumber Co. v. McNeeley & Co.,* 58 Wash. 223, 108 Pac. 621; *Hunter Tract Improvement Co. v. Stone,* 58 Wash. 661, 109 Pac. 112; *Burbank v. Pioneer Mutual Ins. Co.,* 60 Wash. 253, 110 Pac. 1005; *Amherst Inv. Co. v. Meacham,* 69 Wash. 284, 124 Pac. 682; *Benson v. Metropolitan Life Ins. Co.,* 126 Wash. 125, 217 Pac. 709.

In the *Menz Lumber Co.* case, *supra,* acceptance was upon respondent's stationery, which had printed theron, above the typewritten acceptance, the name of respondent, illustration of shingles, capacity of its mills, specialties, etc., including the words: "Quotations subject to change without notice. Contracts made at home office only and contingent upon exigencies of transportation and accidents beyond our control." Similar typewritten matter was upon the letter-heads of appellant.

We there held that the printed matter on the letterhead, not being referred to in either the order or acceptance, was no part of the contract.

It is a general rule, as followed by us in the *Burbank* case, *supra,* that conditions and stipulations endorsed upon the back of an insurance policy, when sufficiently mentioned in the body of the instrument, will become a part of the contract of insurance itself, with the same force and effect as though they had been recited therein; but, if no sufficient reference is made on the face of the policy to such endorsed conditions and stipulations, they cannot be regarded as a part of the contract, but must be ignored, when the policy is being considered to ascertain the obligation devolving upon the insured.

In the *Hunter* case, *supra,* there was a form of assignment on the back of the contract which was signed

in the words, "This assignment is hereby accepted and approved." We held that the contract was completed, signed and acknowledged by the parties, and that provision was not incorporated in the agreement, and that the parties could in no way be bound by it. The general rule is stated in 13 C. J. 279, as follows:

"Terms brought to the acceptor's notice after the agreement is complete will not affect the agreement. Therefore, if a person cannot be charged with notice of the conditions contained in a paper which he accepts as containing the actual offer at the very instant that it is delivered to him, even actual notice afterwards will have no effect."

It has also been held that a bailee of goods for services cannot prescribe the terms on which he will return them, at the time of the return of the bailment of goods, with a statement delivered with the goods requiring all claims to be made within a certain period of time. *Dale v. See,* 51 N. J. L. 378, 18 Atl. 306.

See, also, *Sturtevant Co. v. Fireproof Film Co.,* 216 N. Y. 199, 110 N. E. 440, L. R. A. 1916D, 1069. Also, see case notes after that opinion (do. p. 1072). Also, *Cohen v. Walworth,* 95 Misc. Rep. 479, 158 N. Y. Supp. 1081.

In the last cited case, the court construed the statement in the heading of the contract between the parties. The court directed a verdict in favor of the plaintiff, on the ground that the defendant had failed to call plaintiff's attention to the printed matter in the proposed contract, and, as no evidence was produced to the contrary, the defendants had failed to support their answer. In the case at bar, there is not a stipulation in the contract executed between the parties to be construed, but a mere certificate, afterwards executed in the performance of the contract.

Respondent relies somewhat upon our case of

*Reynolds v. Pacific Marine Ins. Co.,* 98 Wash. 362, 167 Pac. 745, wherein a marginal entry on a policy of insurance was given effect, which absolutely relieved the insurer from liability. In that case, however, it was admitted that the marginal clause was not fraudulently or wrongfully inserted, but that it was done with the authority and permission of the insured. The case has no bearing here.

Other cases are cited by respondent, to the effect that the fact that the condition of the exemption from liability follows the signature does not prevent it from being a part of the certificate in question. An examination of those cases discloses that the matters referred to were referred to in the contract itself, or in some other way admitted or identified by the parties. None of them are opposed to the rule followed by us in the *Menz Lumber Co.* case, *supra.*

We conclude that the trial court was in error, and that the judgment should be reversed, and judgment entered for appellant in the sum found by the trial court, $3,978.99, with costs of action and of appeal.

TOLMAN, C. J., FULLERTON, BRIDGES, and MAIN, JJ., concur.

PARKER, J., (dissenting)—The questions here presented seem to me to be practically wholly questions of fact, having to do with the nature and extent of the duties resting upon respondent and the negligence of its surveyor, for which it might be rendered liable in damages to appellant. Contention is made in behalf of appellant that respondent's surveyor was negligent in failing to discover and report that the tubes were "lap-welded," instead of "seamless." We have seen that appellant himself considered them as "seamless steel boiler tubes," and gave respondent's surveyor to understand that they were of that class. The evidence

supports the conclusion, as the trial court evidently concluded, that ''seamless boiler tubes'' are not readily distinguishable from ''lap-welded boiler tubes,'' and that such distinction can be determined only by critical tests made by a certain technical scientific method. I think it plain from the evidence, that the surveyor was not employed to make such a determination and had the right to assume that the tubes were ''seamless boiler tubes,'' as was assumed and stated by appellant himself. It is true that the surveyor, in his certificates, recites in the introductory portion thereof that the request was to examine ''seamless boiler tubes,'' but I think this is nothing more than a reference to the tubes by that designation, and not a certification that they were in fact seamless boiler tubes. If that erroneous assumption on the part of appellant, and in turn by respondent's surveyor, could have been readily seen to be erroneous by a casual observation of the tubes we would have a different question than is here presented. I am of the opinion that there was no negligence shown on the part of respondent's surveyor in failing to note and inform appellant that the tubes were not in fact seamless boiler tubes. Indeed, that fact was not discovered until a critical examination of them was made by the Bordentown Steel & Tube Corporation, after their arrival at Bordentown, New Jersey, and, even then, a large number of them were found to be seamless boiler tubes.

Contention is further made in behalf of appellant that, since many of the tubes were found to be unduly eccentric after their arrival at Bordentown, respondent became responsible to appellant for such damage as appellant may have suffered by reason of that fact. Respondent's surveyor measured the thickness of the walls of three samples cut from the ends of the tubes,

presumably one from each lot, which samples he used in making the test as to their tensile strength.   He did not measure the walls of any of the other, approximately six thousand, tubes looking to a determination of their eccentricity; and the evidence, I think, warrants the conclusion, as the trial court found, in substance, that such was not the purpose of his employment.   If, however, this was one of the qualities of the tubes which the surveyor was to determine and certify to, by the terms of the employment, it seems to me that it became a question of judgment on his part as to the care to be exercised by his looking to the determination of that quality of the tubes, and that the surveyor's negligence in that behalf was only slight.   The quoted rule, in the application for service made by appellant to respondent's surveyor in April, I think, had the effect of absolving respondent of liability for such slight negligence, if negligence it be; it clearly appearing that the employment by appellant of respondent's surveyor for the second service, to be rendered with reference to the three lots of tubes here in question, was an employment of exactly the same nature as the first employment, though this employment was orally made.

Contention is made in behalf of appellant that the quoted rule, in the first written request of employment, appears therein in fine print and in such obscure manner as to not be binding upon appellant as an agreement limiting its liability.   It is true, the rule itself is quoted in that written request in print somewhat finer than that of the other quoted portions thereof; but, immediately preceding this finely printed rule, there is in printing of the same sized letters as the rest of that written request these words:   "This request is made upon the terms of the rules and regulations of Lloyd's Register of Shipping which provide that."   So appel-

lant's attention was as plainly called to that rule of limited liability as were the other divisions of that written request of employment.

Some further contention is made in behalf of appellant rested upon the fact that this rule of limited liability, under which respondent seeks protection, does not appear in the body of the three certificates above signature of respondent's surveyor. The quotation of the rule does appear immediately following his signature in those certificates, preceded by these introductory words in medium sized plain print: ''This certificate issued upon the terms of the rules and regulations of the society which provide that.'' This was plainly a calling attention to the rule, which became, in effect, a part of the contract of the second employment as it was of the first contract of employment. These certificates do not constitute the employment contract, but the performance of the contract, so this is not a question of marginal notations, or notations below signatures to a contract. In this form, appellant accepted the three certificates which are here claimed to have been negligently given by respondent's surveyor.

Counsel for appellant invoke the general rule of law against one contracting against his own negligence, and, in a brief argument, cite decisions of the courts touching the application of that general rule, which decisions, however, have to do with the contracting by common carriers and bailees for hire, against their negligence with reference to their required care of goods they may have in their possession for carriage or care. Those decisions, I think, are not controlling here; in any event, not controlling to the extent that respondent would be prevented, by law, from contracting against the comparatively slight negligence of its surveyor in the giving to appellant of these three cer-

tificates.   Indeed, counsel for appellant seems to rest his claim of recovery upon the theory that respondent's surveyor was guilty of gross negligence.

Upon the whole record, I am of the opinion that this court is not warranted in holding in this case that the evidence and applicable law do not support the conclusion reached by the trial court.   Its judgment absolving respondent from liability should, therefore, be affirmed.

MACKINTOSH, ASKREN, and MITCHELL, JJ., concur with PARKER, J.

### ON REHEARING.

[*En Banc.*   February 7, 1927.]

PER CURIAM.—Upon a rehearing *En Banc,* a majority of the court adheres to the opinion heretofore filed herein.

Judgment reversed, with directions that judgment be entered for appellant in the sum found by the trial court, $3,978.99, with costs of action and of appeal.